## S00A2059. HULME v. THE STATE.
(544 SE2d 138)

SEARS, Justice.

Connie Hulme was convicted of felony murder, with the underlying felony of distribution of methadone, in connection with the death of Lisa Chastain Brown, who died of multiple drug intoxication.[1] Because the record supports the conclusion that Hulme's felony of distributing methadone was, under the particular facts of this case, a dangerous felony, and because the record supports the finding that Hulme directly caused Brown's death in the commission of that felony, we conclude that the evidence is sufficient to support Hulme's conviction of felony murder. Finding no merit to Hulme's other contention, we affirm.

Brown was a drug addict who had been in and out of treatment programs. Brown's sister, Deborah Headen, often drove Brown to and from various treating facilities. Approximately one month before Brown died, Headen asked Brown if she needed to pick up any prescription drugs. Brown replied that "she didn't need to stop and get any, that Connie [Hulme] gave her ten [milligrams of methadone] a day."

Hulme and Brown were together on the day of Brown's death. At the outset, when Brown first awoke, she appeared to be all right. By lunchtime, however, when Hulme and Brown stopped by Melissa Bryant's house, Brown looked "awful." Bryant testified that Hulme told her that Hulme "was weaning [Brown] on 10 ccs of methadone a day," and that Brown was doing well. Bryant reiterated, however, that at that point, Brown "looked pitiful," and Bryant added that she encouraged Brown to take a bath and spruce up. A few minutes later, Bryant and Hulme went to check on Brown in the bathroom. The water was running and Brown was undressed. But she was not in the bath; she was standing over the toilet, and was "groggy."

According to Bryant, Hulme told Brown "to fight it, fight it." At that point, Hulme admitted to Bryant that "she might have given [Brown] a little too much that morning, and she said it was like taking a Valium or a Xanax; it makes you groggy until you get used to taking it; and that they would go get a hamburger and that would straighten [Brown] up." More specifically, Hulme told Bryant she had

---

[1] Brown died on October 3, 1997, and Hulme was indicted on March 19, 1998. The indictment was couched in two counts. It charged Hulme with felony murder, predicated upon the underlying felony of distribution of methadone; and distribution of methadone. Trial commenced on February 24, 2000, and the jury found Hulme guilty on both counts of the indictment. On March 2, 2000, the trial court sentenced Hulme to life in prison for felony murder. Hulme's timely filed motion for a new trial was denied on July 21, 2000, and Hulme filed a notice of appeal on July 26, 2000. The case was submitted for decision on the briefs on October 23, 2000.

given Brown 20 to 25 milligrams of methadone.

Bryant dressed Brown, and helped her to Hulme's truck because Brown could "hardly even walk by herself." By 2:00 p.m., Brown lost consciousness; she died a few hours later. A forensic toxicologist testified that she found methadone, propoxyphene (the active drug in Darvon), and norpropoxyphene (a metabolite of propoxyphene) in the victim's system, and that the methadone and norpropoxyphene were at lethal levels. She also testified that a person would have to consume about 120 to 140 milligrams of methadone to cause the level of methadone that the toxicologist found in Brown's system. Moreover, the State's medical examiner testified that the methadone, in combination with the propoxyphene, caused Brown's death. He added that, based on the level of methadone found in Brown's system, Brown probably had consumed between 100 to 150 milligrams of methadone.

Hulme had a prescription for methadone for her own use. She claimed that her mother kept her methadone locked up in a refrigerator, and that she had not given any methadone to Brown. At the time of her arrest, however, three bottles of methadone were found in Hulme's purse.

1. Hulme contends that the evidence is insufficient to support the verdict of felony murder. For the reasons that follow, we disagree.

The issue whether a person who has distributed, sold, delivered, or administered a controlled substance may be found guilty of some form of homicide when another person ingests the controlled substance and dies has arisen in a number of jurisdictions. Some states have specifically enacted what can be termed controlled-substance homicide statutes. For example, Florida law provides that it is first degree murder if a death results

> from the unlawful distribution of any substance controlled under § 893.03 (1), cocaine as described in § 893.03 (2) (a) 4., or opium or any synthetic or natural salt, compound, derivative, or preparation of opium by a person 18 years of age or older, when such drug is proven to be the proximate cause of the death of the user.[2]

In states in which there is no controlled substance homicide statute, some courts have concluded that a person, under certain circumstances, may be convicted under the state's general homicide statutes, including those regarding felony murder, for distributing or selling a controlled substance to another person when that person

---

[2] Fla. Stat. Ann. § 782.04 (1) (a) (3). See also N. J. Stat. Ann. § 2C:35-9; La. Rev. Stat. § 14:30.1 (A) (3); Wis. Stat. § 940.02 (2) (a); Minn. Stat. Ann. § 609.195 (b).

uses the controlled substance and dies.[3]

In Georgia, although we have no controlled-substance homicide statute, a person may be convicted of felony murder in this State "when, in the commission of a felony, he causes the death of another human being irrespective of malice."[4] The only limitation on the type of felony that may serve as an underlying felony for a felony murder conviction is that the felony must be inherently dangerous to human life.[5] For a felony to be considered inherently dangerous, it must be "'dangerous per se'" or it must "by its circumstances create[ ] a foreseeable risk of death."[6] "In determining whether a felony meets that definition, this Court does not consider the elements of the felony in the abstract, but instead considers the circumstances under which the felony was committed."[7] Moreover, under Georgia law, the defendant must directly cause the death of the victim to be convicted of felony murder.[8] Thus, in Georgia, a defendant may be convicted of felony murder based on the underlying felony of distributing a controlled substance if that felony is inherently dangerous under the foregoing standards, and if the defendant directly causes the death of the victim while in the commission of the felony. Having carefully reviewed the record in this case, we conclude that, under the circumstances of this case, the evidence is sufficient to support Hulme's conviction for felony murder.

First, the evidence establishes that Hulme controlled the dosages of methadone that the victim took on a daily basis, and that Hulme gave her a dosage on the day of her death that could have been lethal without regard to other drugs the victim might have consumed. We thus conclude that the circumstances under which Hulme committed the felony of distribution of methadone, it was a dangerous felony within the meaning of our felony murder statute.

Moreover, because Hulme was so actively involved with controlling the victim's dosages, because the evidence shows that the victim routinely took the dosages that Hulme provided to her, because the evidence shows that the victim took the potentially lethal dosage

---

[3] *State v. Randolph*, 676 SW2d 943 (Tenn. 1984) (second degree murder under conscious indifference to human life standard); *Sheriff, Clark County v. Morris*, 659 P2d 852 (Nev. 1983) (felony murder); *Heacock v. Commonwealth*, 323 SE2d 90 (Va. 1984) (felony murder); *State v. Wassil*, 658 A2d 548 (Conn. 1995) (manslaughter when death occurs "under circumstances evincing an extreme indifference to human life"); *State v. Mauldin*, 529 P2d 124 (1974) (felony murder).

[4] OCGA § 16-5-1 (c).

[5] *Mosley v. State*, 272 Ga. 881, 883 (536 SE2d 150) (2000); *Ford v. State*, 262 Ga. 602, 603-604 (423 SE2d 255) (1992).

[6] *Mosley*, 272 Ga. at 883.

[7] Id. at 883.

[8] See *State v. Crane*, 247 Ga. 779 (279 SE2d 695) (1981); *Durden v. State*, 250 Ga. 325, 329 (297 SE2d 237) (1982).

from Hulme on the day of her death, and because the potentially lethal dose of methadone contributed to the victim's death, we conclude that Hulme's actions directly caused the victim's death within the meaning of our felony murder statute.[9]

In conclusion, we hold that, under the circumstances of this case, Hulme's distribution of methadone was dangerous and that Hulme directly caused the death of the victim. We expressly do not hold, however, that every delivery or distribution of a controlled substance that results in death can support a felony murder conviction.[10] Our holding today is consistent with holdings of other courts that have required a direct causal connection between the delivery of the controlled substance and the ensuing death.[11] For the foregoing reasons, we conclude that the evidence is sufficient to support Hulme's conviction for felony murder.

2. Hulme asserts the trial court erred in permitting two witnesses, Headen and Christy Comer, to tell the jury what Brown had told them. In this connection, Hulme posits that Brown's statements did not bear sufficient guarantees of trustworthiness as to be admissible under the necessity exception to the hearsay rule.[12] We find no reversible error.

Headen was Brown's only sibling, and Brown confided in Headen with regard to her problems, including her problems with drugs. Headen testified that, approximately one month before she died, Brown told her that she did not need to pick up any prescription medications because Hulme had been giving Brown ten milligrams of methadone a day.

Comer's family and Brown's family had been "friends forever" and Comer and Brown lived in the same apartment complex. Comer kept Brown's mailbox key, and on the day in question, Brown dropped by Comer's apartment to get the key. Comer averred that

---

[9] See *Crane*, 247 Ga. at 779; *Durden*, 250 Ga. at 329.

[10] See *Palmer v. State*, 871 P2d 429, 433 (Okla. Crim. App. 1994) (court affirmed defendant's second degree murder conviction on the ground that even though the defendant knew that the victim had had a severe allergic reaction to cocaine that the defendant had sold him two weeks before his death, the defendant nevertheless sold the victim what the defendant knew was a very potent rock of cocaine; court also specifically stated that it declined to hold that "every delivery of a controlled dangerous substance resulting in death constitutes second degree murder").

[11] See, e.g., *Palmer*, 871 P2d at 433 (discussed at n. 10, supra); *Mauldin*, 529 P2d at 126-127 (where defendant only sold heroin to the victim and the victim ingested the heroin sometime later out of the presence of the defendant, the defendant could not be guilty of felony murder); *Morris*, 659 P2d at 859 (a defendant may be criminally liable for a death resulting from his sale of a controlled substance if the defendant was involved in the victim's ingestion of a lethal dosage; the court also stated that a defendant would not be criminally liable in a situation "involving a sale only or a sale with a nonlethal dosage ingested in the defendant's presence").

[12] See *Chapel v. State*, 270 Ga. 151, 154 (4) (510 SE2d 802) (1998).

Brown appeared to have "been doing something"; and that, when she asked what was wrong, Brown told her "she had just drank a beer."

To introduce a hearsay statement under the necessity exception, there are two prerequisites — necessity and particular guarantees of trustworthiness.[13] Conceding the necessity of Brown's statements to Headen and Comer,[14] Hulme focuses her attack on the reliability of those statements. Because Brown and Headen were sisters, and Brown confided in Headen regarding her drug problems, we conclude that Brown's statement to Headen — that Hulme gave Brown "ten a day" — bears sufficient indicia of trustworthiness.[15]

We need not determine whether Brown's statement to Comer — that she drank a beer on the day in question — was reliable because its admission, even if erroneous, was harmless. Simply put, Brown's statement to Comer did not incriminate Hulme.[16]

For the foregoing reasons, we conclude that the trial court did not err in permitting Headen's testimony regarding Brown's statements to her and that, even if the trial court erred in permitting Comer to testify regarding Brown's statement to her, the error was harmless.

*Judgment affirmed. All the Justices concur.*

DECIDED MARCH 19, 2001 —
RECONSIDERATION DENIED APRIL 12, 2001.

*Thomas M. Strickland,* for appellant.

*Robert W. Lavender, District Attorney, Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Madonna M. Heinemeyer, Assistant Attorney General,* for appellee.

---

[13] *Chapel,* 270 Ga. at 155.

[14] Brown was unavailable, the statements were relevant to a material fact, and the statements were more probative than other statements that may have been procured and offered. *Chapel,* 270 Ga. at 155.

[15] *Ward v. State,* 271 Ga. 648, 650 (520 SE2d 205) (1999) (uncontradicted statements to person in whom victim confided and to whom she turned for help with her problems are admissible under necessity exception). Compare *Slakman v. State,* 272 Ga. 662, 668 (533 SE2d 383) (2000) (victim's statements to mother possessed sufficient indicia of trustworthiness where victim confided in mother and sought her help and advice regarding marital problems) with *McWilliams v. State,* 271 Ga. 655 (521 SE2d 824) (1999) (victim's statement to sister was not trustworthy since victim did not confide in sister on a regular basis).

[16] See generally *Smith v. State,* 266 Ga. 827 (4) (470 SE2d 674) (1996) (erroneous admission of hearsay under necessity exception may be harmless).