## S11A0051. CHUA v. THE STATE.

(710 SE2d 540)

HINES, Justice.

Noel Chua appeals his convictions for felony murder and violating the Georgia Controlled Substances Act, in connection with the death of James B. Carter.[1] For the reasons that follow, we affirm in part and vacate in part.

---

[1] Carter died on December 15, 2005. On September 13, 2006, a Camden County grand jury indicted Chua for: Count 1 – felony murder in the commission of Violation of the Georgia Controlled Substances Act by distributing multiple controlled substances to Carter over a period of time by prescribing them to him, said prescriptions not being for a legitimate purpose and not being in the usual course of Chua's professional practice; Count 2 – Violation of the Georgia Controlled Substances Act by distributing multiple controlled substances to Carter over a period of time by prescribing them to him, said prescriptions not being for a legitimate purpose and not being in the usual course of Chua's professional practice; Count 3 – felony murder in the commission of Violation of the Georgia Controlled Substances Act by distributing the controlled substances methadone, morphine, and oxycodone to Carter over a period of time by prescribing them to him, said prescriptions not being for a legitimate purpose and not being in the usual course of Chua's professional practice; Count 4 – Violation of the Georgia Controlled Substances Act by distributing the controlled substances methadone, morphine, and oxycodone to Carter by prescribing them to him, said prescriptions not being for a legitimate purpose and not being in the usual course of Chua's professional practice; Count 5 – Violation of the Georgia Controlled Substances Act by keeping a dwelling place for the purpose of using controlled substances; Count 6 – Violation of the Georgia Controlled Substances Act by, on September 22, 2005, distributing the controlled substance hydrocodone to Carter by prescribing it to him, said prescription not being for a legitimate purpose and not being in the usual course of Chua's professional practice; Count 7 – Violation of the Georgia Controlled Substances Act by, on October 14, 2005, distributing the controlled substance Loritab (hydrocodone) to Carter by prescribing it to him, said prescription not being for a legitimate purpose and not being in the usual course of Chua's professional practice; Count 8 – Violation of the Georgia Controlled Substances Act by, on November 8, 2005, distributing the controlled substance Stadol nasal spray (butorphanol) to Carter by prescribing it to him, said prescription not being for a legitimate purpose and not being in the usual course of Chua's professional practice; Count 9 – Violation of the Georgia Controlled Substances Act by, on November 14, 2005, distributing the controlled substance Duragesic patch (fentanyl) to Carter by prescribing it to him, said prescription not being for a legitimate purpose and not being in the usual course of Chua's professional practice; Count 10 – Violation of the Georgia Controlled Substances Act by, on November 15, 2005, distributing the controlled substance MS contin (morphine) to Carter by prescribing it to him, said prescription not being for a legitimate purpose and not being in the usual course of Chua's professional practice; Count 11 – Violation of the Georgia Controlled Substances Act by, on November 18, 2005, distributing the controlled substance morphine to Carter by prescribing it to him, said prescription not being for a legitimate purpose and not being in the usual course of Chua's professional practice; Count 12 – Violation of the Georgia Controlled Substances Act by, on November 15, 2005, distributing the controlled substance Demerol (meperidine) to Carter by prescribing it to him, said prescription not being for a legitimate purpose and not being in the usual course of Chua's professional practice; Count 13 – Violation of the Georgia Controlled Substances Act by, on

1. Carter died of drug intoxication brought about by a self-inflicted combination of morphine, oxycodone, and methadone. Chua, a physician, wrote prescriptions for Carter for these, and other, drugs. At the time of his death, Carter lived in Chua's home and did some work in Chua's office; it was in the home that Chua discovered the body. Chua asserts that the evidence was insufficient to authorize the jury to find him guilty of: (a) violating the Georgia Controlled Substances Act ("VGCSA") by distributing controlled substances; (b) felony murder; and (c) VGCSA by keeping a dwelling for the purpose of using controlled substances.

> When this Court reviews the sufficiency of the evidence, it does not re-weigh the evidence or resolve conflicts in witness testimony, but instead it defers to the jury's assessment of the weight and credibility of the evidence. [Cit.] Our role is to examine the evidence under the standard of *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). [Cit.]

---

November 18, 2005, distributing the controlled substance Demerol (meperidine) to Carter by prescribing it to him, said prescription not being for a legitimate purpose and not being in the usual course of Chua's professional practice; Count 14 – Violation of the Georgia Controlled Substances Act by, on November 23, 2005, distributing the controlled substance clonazepam to Carter by prescribing it to him, said prescription not being for a legitimate purpose and not being in the usual course of Chua's professional practice; Count 15 – Violation of the Georgia Controlled Substances Act by, on November 28, 2005, distributing the controlled substance OxyContin to Carter by prescribing it to him, said prescription not being for a legitimate purpose and not being in the usual course of Chua's professional practice; Count 16 – Violation of the Georgia Controlled Substances Act by, on November 28, 2005, distributing the controlled substance Percocet to Carter by prescribing it to him, said prescription not being for a legitimate purpose and not being in the usual course of Chua's professional practice; Count 17 – Violation of the Georgia Controlled Substances Act by, on December 8 and 9, 2005, distributing the controlled substance Demerol (meperidine) to Carter by prescribing it to him, said prescription not being for a legitimate purpose and not being in the usual course of Chua's professional practice; Count 18 – Violation of the Georgia Controlled Substances Act by, on December 9, 2005, distributing the controlled substance methadone to Carter by prescribing it to him, said prescription not being for a legitimate purpose and not being in the usual course of Chua's professional practice; and Count 19 – Violation of the Georgia Controlled Substances Act by, on December 12, 2005, distributing the controlled substance methadone to Carter by prescribing it to him, said prescription not being for a legitimate purpose and not being in the usual course of Chua's professional practice. Chua was tried before a jury October 9-12 and 14-20, 2007, and found guilty of Counts 3, 4, 5, 15, 16, 18, and 19; Counts 1 and 2 were not presented to the jury, and Chua was found not guilty of all other remaining charges in the indictment. On October 25, 2007, the trial court sentenced Chua to life in prison for felony murder, and a concurrent term of five years in prison for Violation of the Georgia Controlled Substances Act by keeping a dwelling place for the purpose of using controlled substances; Counts 4, 15, 16, 18, and 19 merged with the crime of felony murder, *Malcolm v. State*, 263 Ga. 369, 372-374 (4), (5) (434 SE2d 479) (1993), and the court dismissed Counts 1 and 2 of the indictment. On October 25, 2007, Chua filed a motion for a new trial, which he amended on March 4, 2010; the motion as amended was denied on April 28, 2010. Chua filed a notice of appeal on May 3, 2010; his appeal was docketed for the January 2011 term of this Court, and orally argued on March 7, 2011.

*Greeson v. State*, 287 Ga. 764, 765 (700 SE2d 344) (2010).

(a) The jury found Chua guilty of multiple counts of distributing controlled substances by prescribing them in a manner that was not "in the usual course of his professional practice," and was not "for a legitimate medical purpose," in violation of OCGA § 16-13-41 (f);[2]

---

[2] OCGA § 16-13-41 reads:

(a) Except when dispensed directly by a registered practitioner, other than a pharmacy or pharmacist, to an ultimate user, no controlled substance in Schedule II may be dispensed without the written prescription of a registered practitioner.

(b) When a practitioner writes a prescription drug order to cause the dispensing of a Schedule II substance, he or she shall include the name and address of the person for whom it is prescribed, the kind and quantity of such Schedule II controlled substance, the directions for taking, the signature, and the name, address, telephone number, and DEA registration number of the prescribing practitioner. Such prescription shall be signed and dated by the practitioner on the date when issued, and the nature of such signature shall be defined in regulations promulgated by the State Board of Pharmacy. Prescription drug orders for Schedule II controlled substances may be transmitted via facsimile machine or other electronic means only in accordance with regulations promulgated by the State Board of Pharmacy in accordance with Code Section 26-4-80 or 26-4-80.1, or in accordance with DEA regulations at 21 C.F.R. 1306.

(c) In emergency situations, as defined by rule of the State Board of Pharmacy, Schedule II drugs may be dispensed upon oral prescription of a registered practitioner, reduced promptly to writing and filed by the pharmacy. Prescriptions shall be retained in conformity with the requirements of Code Section 16-13-39. No prescription for a Schedule II substance may be refilled.

(d) (1) Except when dispensed directly by a practitioner, other than a pharmacy or pharmacist, to an ultimate user, a controlled substance included in Schedule III, IV, or V, which is a prescription drug as determined under any law of this state or the Federal Food, Drug and Cosmetic Act, 21 U.S.C. Section 301, 52 Stat. 1040 (1938), shall not be dispensed without a written or oral prescription of a registered practitioner. The prescription shall not be filled or refilled more than six months after the date on which such prescription was issued or be refilled more than five times.

(2) When a practitioner writes a prescription drug order to cause the dispensing of a Schedule III, IV, or V controlled substance, he or she shall include the name and address of the person for whom it is prescribed, the kind and quantity of such controlled substance, the directions for taking, the signature, and the name, address, telephone number, and DEA registration number of the practitioner. Such prescription shall be signed and dated by the practitioner on the date when issued or may be issued orally, and the nature of the signature of the prescriber shall meet the guidelines set forth in Chapter 4 of Title 26, the regulations promulgated by the State Board of Pharmacy, or both such guidelines and regulations.

(e) A controlled substance included in Schedule V shall not be distributed or dispensed other than for a legitimate medical purpose.

(f) No person shall prescribe or order the dispensing of a controlled substance, except a registered practitioner who is:

(1) Licensed or otherwise authorized by this state to prescribe controlled substances;

(2) Acting in the usual course of his professional practice; and

(3) Prescribing or ordering such controlled substances for a legitimate medical purpose.

(g) No person shall fill or dispense a prescription for a controlled substance except a person who is licensed by this state as a pharmacist or a pharmacy intern

specifically, he was found guilty of distributing methadone and oxycodone on unspecified dates, distributing OxyContin and Percocet (both oxycodone drugs) on November 28, 2005, and distributing methadone on December 9 and December 12, 2005.

As part of the State's effort to show that Chua's acts of prescribing the drugs to Carter were not in the usual course of his medical practice and not for a legitimate medical purpose, the State argued that an inappropriate relationship beyond that of physician and patient had developed between Chua and Carter. Construed to support the verdicts, the evidence showed that Chua, a physician, became acquainted with Carter on September 22, 2005, when Carter, then 19 years of age, sought treatment for pain, mostly from headaches. Chua's notes of the initial visit indicate that Carter was "afraid of being labeled a drug seeker"; under "Social History," Chua noted, "[d]enies smoking, no illicit drugs, denies alcohol abuse . . . ." On that day, Chua gave Carter a prescription for 60 pills of hydrocodone; his record carries the notation: "advised about abuse potential." The next day, at 7:19 p.m., Chua called Carter from his cell phone; his next cellular telephone call to Carter was November 2, 2005, at which point cellular telephone and text contact between the two men increased, sometimes numbering more than 20 instances a day.

Carter's second office meeting with Chua was on October 14, 2005; Chua's notes regarding that appointment contain no mention of Carter's fear of being labeled a drug seeker, and the "Social History" notation is simply: "denies smoking, no alcohol abuse." The record of that visit also shows: "given refill of lortab . . . ," which is a brand name for a hydrocodone drug. Chua also obtained copies of Carter's previous medical records, which showed a history of painkiller use. Over the next several weeks, Carter had several other visits at Chua's office, and received several different prescriptions, for a variety of painkillers. There were several other office visits in

acting under the immediate and direct personal supervision of a licensed pharmacist in a pharmacy licensed by the State Board of Pharmacy, provided that this subsection shall not prohibit a registered physician, dentist, veterinarian, or podiatrist authorized by this state to dispense controlled substances as provided in this article if such registered person complies with all record-keeping, labeling, packaging, and storage requirements regarding such controlled substances and imposed upon pharmacists and pharmacies in this chapter and in Chapter 4 of Title 26 and complies with the requirements of Code Section 26-4-130.

(h) It shall be unlawful for any practitioner to issue any prescription document signed in blank. The issuance of such document signed in blank shall be prima-facie evidence of a conspiracy to violate this article. The possession of a prescription document signed in blank by a person other than the person whose signature appears thereon shall be prima-facie evidence of a conspiracy between the possessor and the signer to violate the provisions of this article.

the ensuing weeks. Chua's notes regarding these visits do not contain any mention of Carter as a drug seeker, a user of illicit drugs, or a drug addict.[3] Chua never billed Carter's insurance company for any of the office visits Carter made.

Carter moved from his father's home in early November; a month earlier, Carter told a different physician that his parents supervised the taking of his hydrocodone prescription and were controlling the pills. After Carter moved, on at least one occasion, Chua took the unusual step of visiting a pharmacy to write a prescription for drugs for Carter, while in the company of Carter. On a pharmacy visit on November 28, 2005, when Carter was alone, a pharmacist noticed that Chua had prescribed two opiates for Carter on the same prescription slip, and placed a notation on the prescription to the effect that he told Carter that this was excessive, and that Carter had responded that Chua was destroying previous prescriptions as they were not working; at that time, Chua had prescribed six pain medications in the last twenty days. A psychiatrist who had treated Carter, and who reviewed Chua's medical records opined that, from November 8, 2005 forward, it was "Katy-bar-the-door" as far as Chua's prescriptions were concerned, which he considered excessive.

In early November, Chua attended a party accompanied by Carter; there, Carter said that he was "shadowing" Chua, including making rounds with him at the hospital while dressed in "scrubs"; although Chua had previously acted as a mentor to young people interested in medical careers, it was unusual for a student to go on rounds with him. During November, or December, Carter, while attending a nearby college, appeared about to faint and had slurred speech. He had a prescription bottle with Chua's name on it, but Carter told college personnel that they did not need to telephone Chua because they were "partners"; Carter said, "I live with him. He takes care of me." While Carter was in a laboratory class with an instructor who was a former mentee of Chua, Chua sent a text message to Carter to tell the instructor to give him an "A" in the class.

Chua had Carter admitted to a hospital on November 17, 2005 on Chua's diagnosis of acute gastroenteritis and severe headache. Carter told a nurse that the intravenous morphine he was being given was not proving effective, and asked her for Demerol. He also asked the nurse to administer the Demerol by injecting it "faster and

---

[3] Despite Chua's failure to comment on addiction in Carter's medical records, Chua told Carter's sister that, when he first met Carter, he thought him to be a troubled young man, and that he believed he had "a drug problem," specifically mentioning cocaine.

in the lowest port possible," so that he could "feel it." When the nurse told Chua of this episode, and expressed her concerns that Carter was displaying signs of being an addict, Chua responded that if Carter was an addict, they would "find out soon enough"; Chua approved the use of Demerol, including the administration of an additional intravenous dose just before Carter's discharge, an unusual procedure. When Carter was discharged, Chua drove him away from the hospital. An expert who examined the records concerning the hospitalization concluded that the diagnosis of gastroenteritis was "a fabrication to make the hospitalization look more legitimate," and that the true cause of Carter's nausea was opiate withdrawal.

At a Thanksgiving gathering with his family on November 24, 2005, Carter arrived late, accompanied by Chua. He could not carry on a conversation and was shaking such that he had difficulty keeping food on his fork. Later that day, Carter and Chua were alone at the home of Carter's mother; when Carter's sister arrived, she found Carter asleep in his bed, and Chua lying on top of the bed next to him. After Thanksgiving, Chua and Carter took a trip to New York City. Before the trip, Chua had a lab report done on Carter's blood that included testing for the presence of HIV; Chua's records did not contain any consent from Carter for such a test.

Just before a final examination in a college class on December 6, 2005, Carter entered the classroom stumbling, as though drunk. He was unable to take the exam without assistance as his vision was blurred and he could not hold a pen. A student drove Carter's pickup truck, with Carter in the passenger seat, to Chua's residence; another student followed in a separate vehicle. On the drive, Carter took some pills from a prescription bottle and swallowed them. At the gate to Chua's residential community, Carter took over driving his pickup truck and the other students were left outside the gate. The students discussed the situation during the drive back to the college, and one returned to the gated community. There, through the intercom system at the gate, the student stressed to Chua his concerns regarding Carter's condition, and informed Chua that Carter had taken additional pills during the trip to Chua's, which Carter had said were pain medications; Chua's only response to this information was "Oh, okay. Thanks."

Chua again had Carter hospitalized on December 8, 2005; Carter was incoherent and obviously under the influence of drugs. Chua again ordered Demerol, and Carter was discharged on December 9, 2005. Chua's records show that Carter visited Chua's office on December 9, 2005, and state that Carter would be given methadone;

Chua's record of this visit does not mention any hospitalization, which would be the normal practice when a hospitalization had just been completed. That day, Chua gave Carter a prescription for 60 methadone pills; on December 12, 2005, he gave him a prescription for an additional 30 pills, which Carter filled at a pharmacy different from the one used on December 9, 2005. Chua did not make any office record of the December 12, 2005 prescription, which is unusual in medical practice; some prior prescriptions for controlled painkillers were also not recorded, and not mentioned later in Chua's records concerning whether drugs were proving effective for Carter.

Carter's fatal drug ingestion was on December 15, 2005. Numerous pill bottles, loose pills, syringes, and drug patches were found in the bedroom that Carter used; no bottle reflecting a December 9 prescription was present. At trial, Chua produced a prescription bottle of methadone showing on the label that he had prescribed it for Carter on December 9, 2005; the original prescription had been for 60 pills, and the bottle contained 54 when counted at trial. When Chua was arrested, ten months after Carter's death, he telephoned his sister, instructed her to go to his house, retrieve this bottle from a box in Chua's bedroom, and deliver it to his then-attorney, which she did.

Chua told the investigating officer on the night of Carter's death that, earlier in the morning, Carter arrived at Chua's office for work, but was sleepy and said his eyes hurt; Chua accompanied Carter home about 12:30 p.m., returned to his office, returned to his home at about 6:30 p.m.,[4] and found Carter about 25 minutes later.[5] He told the officer that when he arrived home, he thought Carter was sleeping, but later found him in his guest bathroom, dead, and that his first telephone call was to his office secretary, who told him to dial 911. He also said that he was aware of the number of drugs in Carter's room, but "did not want to violate [Carter's] rights" by removing them.

Carter's cell phone was used to make a call at 1:26 p.m. At 2:46 p.m., a telephone call was placed from Chua's office to Carter's cell phone, and another was placed at 2:47 p.m.; both of those calls were

---

[4] Records from the security gates at Chua's subdivision showed him entering at 12:16 p.m., and again at 6:07 p.m.

[5] An expert testified that, if he were presented with a patient with Carter's symptoms, and knew of the drugs that Carter had been prescribed, if he took that patient to a place to sleep, he would expect to find the patient dead six hours later. Chua's act of taking Carter home in such a state, and then returning to his office without providing medical care for Carter supports the inference that Chua's relationship with Carter was not that of physician and patient, and that acts taken toward Carter were not in the usual course of Chua's professional practice.

timed at less than one minute, suggesting that they were not answered.

Medical experts testified regarding Chua's prescriptions to Carter and the legitimate practice of medicine. See *United States v. Rosen*, 582 F2d 1032, 1037, n. 10 (5th Cir. 1978). See also *State v. Young*, 406 SE2d 758, 776 (E) (W. Va. 1991). An expert testified that Chua's course of drug treatment for Carter, from November 8 to December 15, would be expected to create a physiological dependence in any patient, even if the patient did not have any prior addictive tendency. There was testimony that Carter exhibited signs of drug abuse that would have been recognized by a treating physician, that prescriptions Chua wrote for Carter were in pursuit of something other than a legitimate medical purpose, and that it appeared that Chua's prescriptions constituted "providing drugs."

Chua notes that his is not a case in which a physician is essentially trafficking in controlled substances to multiple persons. See, e.g., *United States v. Moore*, 423 U. S. 122 (96 SC 335, 46 LE2d 333) (1975); *United States v. Williams*, 445 F3d 1302 (11th Cir. 2006), abrogated on other grounds by *United States v. Lewis*, 492 F3d 1219 (11th Cir. 2007). However, the question is not what Chua's actions "were not," but "what they were"; nothing in OCGA § 16-13-41 (f) confines its application to physicians who are trafficking in drugs to multiple parties. Although Chua essentially asserts that the evidence demonstrates nothing more than poor performance by a physician in treatment and record keeping, the expert testimony and other evidence indicates otherwise. Chua notes that he produced expert testimony that the prescriptions he wrote were reasonable in a therapeutic pursuit of pain management, but such conflicting testimony was just that, conflicting evidence. And, the resolution of such evidentiary conflicts is the province of the jury, not this Court. *Hampton v. State*, 272 Ga. 284, 285 (1) (527 SE2d 872) (2000).

In view of the foregoing, we conclude that the evidence authorized the jury to find Chua guilty beyond a reasonable doubt of violating OCGA § 16-13-41 (f). *Jackson v. Virginia*, supra; *Greeson*, supra.

(b) Chua contends that, even if the evidence authorized the jury to find him guilty of violating OCGA § 16-13-41 (f), it did not authorize a finding of guilt as to the crime of felony murder. As Chua recognizes, the State had to prove that his distribution of controlled substances as set forth in the indictment was the proximate cause of Carter's death. See *State v. Jackson*, 287 Ga. 646 (697 SE2d 757) (2010). The indictment alleged that Chua committed felony murder by causing Carter's death through violation of OCGA § 16-13-41 (f),

which was committed by

> being a physician authorized by this State to prescribe controlled substances, did distribute controlled substances, to wit: methadone (schedule II), morphine (schedule II), oxycodone (schedule II), by prescribing said drugs to James B. Carter, said prescriptions not being for a legitimate medical purpose and said act not being in the usual course of said accused's professional practice . . . .

By a special verdict form, the jury found Chua not guilty of the unlawful prescription of morphine as to the predicate felony set forth in the referenced count of the indictment, but guilty of the unlawful prescription of both methadone and oxycodone.

This Court has previously addressed felony murder convictions when the underlying felony is the illegal distribution of controlled substances. We have noted that

> [t]he only limitation on the type of felony that may serve as an underlying felony for a felony murder conviction is that the felony must be inherently dangerous to human life. For a felony to be considered inherently dangerous, it must be " 'dangerous per se' " or it must "by its circumstances create a foreseeable risk of death." "In determining whether a felony meets that definition, this Court does not consider the elements of the felony in the abstract, but instead considers the circumstances under which the felony was committed."

*Hulme v. State*, 273 Ga. 676, 678 (1) (544 SE2d 138) (2001).

Chua contends that there was no foreseeable risk of death in this case. But, the evidence was that he was aware of Carter's drug problems and potential for addiction, and that he nonetheless provided him with drugs dangerous to such a person. Although Chua notes that Carter did not take as directed the prescriptions that caused his death, there was expert testimony that a drug addict may not take medication as prescribed, and that is one reason that providing controlled substances to one who may be an addict is dangerous.

Further, Chua's acts on the evening Carter died support the conclusion that he realized his history of prescribing drugs to Carter posed a foreseeable risk of death, and that he wished to avoid consequences flowing from that risk. Chua was not honest with the officials who investigated Carter's death. That evening, he told the coroner that Carter had not had any hospitalizations, when in fact

Chua had supervised two, including one within the past week. He also told a police officer that he had prescribed "methadone only" for Carter, as treatment for headaches. And, he did not produce the bottle from the December 9, 2005 methadone prescription during the nine months between Carter's death and his own arrest.

Chua knew Carter's medical history and condition. Under the facts of this case, his felonies of illegally providing controlled substances through prescriptions were dangerous felonies, and Carter's death was a foreseeable result within the meaning of the felony murder statute. *Hulme,* supra; *Carter v. State,* 285 Ga. 394, 395-396 (2) (677 SE2d 71) (2009). See also *Skaggs v. State,* 278 Ga. 19, 20 (1) (596 SE2d 159) (2004); *Green v. State,* 266 Ga. 758, 760 (2) (b) (470 SE2d 884) (1996).

Chua also asserts that the State failed to establish that the drugs fatally ingested by Carter were the same drugs that he had prescribed to him, and were thus the proximate cause of Carter's death. He notes that some bottles in Carter's bedroom reflected that they were prescriptions made by Chua to persons other than Carter, and some were made to other persons by other physicians,[6] and specifically notes that no oxycodone found in Carter's bedroom was linked to his prescriptions, nor were the corresponding pill bottles there.[7] However, this ignores the expert testimony that the methadone in Carter's blood alone was sufficient to kill him.

> Where one commits a felony upon another, such felony is to be accounted as the efficient, proximate cause of the death whenever it shall be made to appear either that the felony directly and materially contributed to the happening of a subsequent accruing immediate cause of the death, or that the injury materially accelerated the death, although proximately occasioned by a pre-existing cause.

*Durden v. State,* 250 Ga. 325, 329 (5) (297 SE2d 237) (1982). There was no evidence that Carter had access to any methadone other than that prescribed by Chua. As in *Hulme,* supra, the methadone Chua

---

[6] A search of Chua's office in September 2006 produced nine prescription bottles, primarily containing controlled painkillers, that were similarly made to other persons by either Chua or another physician. One physician expert testified that when a patient gave him prescription painkillers that were deemed ineffective, he immediately destroyed them, as "you don't want them around your office if you can avoid it. It can be enticing to thieves who work for you or other patients, and if it gets known that you keep a lot of drugs around your office, you're inviting someone to come burglarize you or armed robbery."

[7] Of course, the jury could have concluded that Carter consumed his remaining supply of those pills in his fatal ingestion, and that, as he did with other drugs, kept them in bottles whose labels did not correspond to the contents.

unlawfully distributed to Carter was such that it "could have been lethal without regard to other drugs the victim might have consumed."[8] See also *Carter, supra.* Accordingly, the jury was authorized to find the evidence established, at the very least, that Chua's act of prescribing the methadone "directly and materially contributed" to Carter's death.[9] *Durden, supra.*

The evidence authorized the jury to find Chua guilty beyond a reasonable doubt of felony murder by violating OCGA § 16-13-41 (f). *Jackson v. Virginia, supra; Greeson, supra.*

(c) Chua was also convicted of knowingly keeping a dwelling for the purpose of using controlled substances in violation of OCGA § 16-13-42 (a) (5).[10] In discussing this Code section, this Court has stated:

> First, we hold that in order to support a conviction under [OCGA] § 16-13-42 (a) (5) for maintaining a residence or other structure or place used for keeping controlled substances, the evidence must show that one of the *purposes* for maintaining the structure was the keeping of the controlled substance; thus, the mere possession of limited quantities of a controlled substance within the residence or structure is insufficient to support a conviction under [OCGA] § 16-13-42

---

[8] And, as in *Hulme,* "[w]e expressly do not hold . . . that every delivery or distribution of a controlled substance that results in death can support a felony murder conviction." (Footnote omitted.) Id. at 679 (1).

[9] The jury was instructed that "the death must be the probable consequence or the natural or necessary result of the unlawful act of any of the defendant's alleged violations of the Georgia Controlled Substances Act as set forth in" the indictment.

[10] OCGA § 16-13-42 reads:

(a) It is unlawful for any person:

(1) Who is subject to the requirements of Code Section 16-13-35 to distribute or dispense a controlled substance in violation of Code Section 16-13-41;

(2) Who is a registrant to manufacture a controlled substance not authorized by his registration or to distribute or dispense a controlled substance not authorized by his registration to another registrant or other authorized person;

(3) To refuse or fail to make, keep, or furnish any record, notification, order form, statement, invoice, or information required under this article;

(4) To refuse an entry into any premises for any inspection authorized by this article; or

(5) Knowingly to keep or maintain any store, shop, warehouse, dwelling, building, vehicle, boat, aircraft, or other structure or place which is resorted to by persons using controlled substances in violation of this article for the purpose of using these substances, or which is used for keeping or selling them in violation of this article.

(b) Any person who violates this Code section is guilty of a felony and, upon conviction thereof, may be imprisoned for not more than five years, fined not more than $25,000.00, or both.

(a) (5). Second, we hold that in order to support a conviction under this statute for maintaining a residence or other structure or place used for selling controlled substances, the evidence must be sufficient to support a finding of something more than a single, isolated instance of the proscribed activity. [Cit.] Thirdly, we hold that in determining the sufficiency of the evidence in these regards, each case must be adjudged according to its own unique facts and circumstances, and there is no inflexible rule that evidence found only on a single occasion cannot be sufficient to show a crime of a continuing nature.

(Footnote omitted; emphasis supplied.) *Barnes v. State*, 255 Ga. 396, 402 (5) (339 SE2d 229) (1986).

The only evidence was that the building in question was Chua's home; there was no evidence that one of the *purposes* for maintaining the home was to provide Carter a place to use and keep controlled substances. While the jury could infer that controlled substances had been kept and used there on more than one occasion by Carter, without a showing that a purpose of Chua's maintaining the house was for such use by Carter, a guilty verdict was not authorized. *Greeson*, supra; *Barnes*, supra. Accordingly, the judgment of conviction and sentence on this count must be vacated.

2. The trial court allowed the State to introduce the testimony of two other young men who formed relationships with Chua. One began seeing Chua as a patient when he was sixteen; three years later, he checked himself into a medical facility because of an addiction that started with hydrocodone prescribed by Chua, and which progressed to a cocaine addiction. When the patient left the facility, against the advice of the medical personnel there, the physician at the facility would not give him a prescription for Ativan, a controlled anti-anxiety drug, because of the patient's addiction. He then went to Chua and told him of his stay in the facility, and the reasons for it, and said that he was there to get the drugs he was unable to get when he checked out of the facility. Chua prescribed Ativan for him,[11] in the amount of 90 pills; that same day, the patient took an overdose of the Ativan, began hallucinating, and was hospitalized. During their relationship, Chua invited the patient to come work for him, and to come to his house to use his jet skis.

Another young man was in elementary school when he met Chua. He came from Pennsylvania to work in Chua's office in the

---

[11] Upon his departure from the facility, the patient was given prescriptions for two non-controlled drugs to treat his bipolar disorder; Chua gave him additional prescriptions for these, at the patient's request.

summer of 2004, between his tenth and eleventh grades in high school, lived in Chua's home, and the relationship became sexual. He returned the next summer with a similar arrangement, although the sexual nature of the relationship was not repeated. That summer, he went on a trip with Chua to the nation of Turkey, at Chua's expense. Although Chua treated a medical condition for this young man, he did not prescribe him any painkillers.

Evidence of independent acts or similar transactions

> must satisfy three elements to be admitted: (1) the evidence must be introduced for a proper purpose; (2) the evidence must establish by a preponderance of the evidence that the defendant perpetrated the similar transaction; and (3) the two transactions must be sufficiently similar or connected so that the existence of the former transaction tends to prove the latter transaction. [Cits.]

*Bryant v. State*, 282 Ga. 631, 634 (3) (651 SE2d 718) (2007). The evidence is not to be admitted, however, if it merely raises an improper inference about the character of the accused. *Humphrey v. State*, 281 Ga. 596, 598 (2) (642 SE2d 23) (2007). To be admissible, an independent act "does not have to mirror every detail" of the crime charged, *Collum v. State*, 281 Ga. 719, 723 (4) (642 SE2d 640) (2007), and may reflect only a portion of the acts that establish the crimes being tried. See, e.g., *Oliver v. State*, 276 Ga. 665, 667 (3) (581 SE2d 538) (2003) (Evidence of defendant's entry by key into the apartments of women, "ostensibly for maintenance purposes," was sufficiently similar to charges of malice murder and burglary, which crimes included the unforced entry of the victim's apartment.). And, "similar transaction evidence is not limited to a defendant's previous illegal conduct. [Cit.]" *Phagan v. State*, 268 Ga. 272, 279 (4) (486 SE2d 876) (1997). "[W]hen similar transaction evidence is used to show bent of mind, course of conduct, motive or intent, 'a lesser degree of similarity is required than when such evidence is introduced to prove identity.' [Cit.]" *Barnes v. State*, 287 Ga. 423, 426 (3) (696 SE2d 629) (2010). "A trial court's decision to admit similar transaction evidence will not be disturbed absent an abuse of discretion. [Cit.]" *Moore v. State*, 288 Ga. 187, 190 (3) (702 SE2d 176) (2010).

When the above evidence was admitted, and again during the final jury instructions, the trial court instructed the jury that the evidence could be used only for the limited purposes of showing, if it did, "motive, intent, or course of conduct." Such are proper purposes, and the evidence showed a course of conduct by which Chua would use his position as a physician, and his access to prescription drugs, to facilitate relationships with young men, such as the one

cultivated with Carter, during which Chua acted beyond his role as a physician when writing prescriptions for Carter. The trial court did not err in admitting the evidence.

3. Chua requested a jury charge on "good faith," including that the State has the burden of proving beyond a reasonable doubt that he was not acting in good faith when prescribing controlled substances allegedly in violation of OCGA § 16-13-41 (f), and that he had no burden of proving that he was acting in good faith. The jury was fully instructed on the burden of proof and that the defendant had none, and on the elements of the crime of violating OCGA § 16-13-41 (f). Further, the court instructed the jury that a physician could not be found guilty of prescribing controlled substances outside the usual course of his professional practice and not for a legitimate medical purpose "when he distributes controlled substances in good faith to patients in the regular course of a professional practice," and that "good faith . . . involves his sincerity in attempting to conduct himself in accordance with a standard of medical practice generally recognized and accepted in this State." The applicable principles of law were substantially covered in the court's charge, and it was not error to fail to give the exact instruction Chua requested. *Walker v. State*, 282 Ga. 406, 408 (2) (651 SE2d 12) (2007).

*Judgments affirmed in part and vacated in part. Hunstein, C. J., Carley, P. J., Benham, Thompson and Melton, JJ., and Judge Daniel J. Craig concur. Nahmias, J., disqualified.*

DECIDED MAY 31, 2011.

*Garland, Samuel & Loeb, Donald F. Samuel*, for appellant.

*Jacquelyn L. Johnson, District Attorney, Thurbert E. Baker, Attorney General, Paula K. Smith, Senior Assistant Attorney General, Benjamin H. Pierman, Assistant Attorney General*, for appellee.