944 So.2d 1137 (2006)
Michael AUMULLER, Appellant,
v.
STATE of Florida, Appellee.
No. 2D05-2097.
District Court of Appeal of Florida, Second District.
December 8, 2006.
Rehearing Denied January 8, 2007.
*1138 James Marion Moorman, Public Defender, and Tosha Cohen, Assistant Public Defender, Bartow, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Cerese Crawford Taylor, Assistant Attorney General, Tampa, for Appellee.
FULMER, Chief Judge.
Michael Aumuller challenges his conviction for first-degree murder by drug distribution in violation of section 782.04(1)(a)(3), Florida Statutes (2001).[1] He raises two issues on appeal. We reject the first issue because the trial court properly denied Aumuller's request for a jury instruction regarding a break in the chain of causation, and we write to explain our reasoning. We reject without further discussion the second issue concerning comments by a State witness and the prosecutor because we conclude that the comments complained of do not rise to a level of prejudice that merits a new trial.
The indictment charged that Aumuller "did unlawfully distribute . . . heroin, which was the proximate cause of the death of Ja[ir]on Nevius." At trial, the State presented the testimony of Ryan Connaughton, Jason Aykroyd, and Jason Howlett, three friends of the deceased, each of whom recounted the events on the day that Nevius died.
According to Connaughton, he met Nevius in the early afternoon on March 9, 2002, and began "partying." They used marijuana and cocaine. Nevius also drank alcohol and used Valium. Nevius came up with the idea of getting heroin. They ran into Aykroyd, who joined them at Nevius's apartment. They discussed their desire to obtain heroin. Aykroyd used his cell phone to call someone, and then the three went in Aykroyd's car to a gas station to get the heroin. By this time, it was dark outside. Aumuller and a woman arrived in a red sports car and both came to Aykroyd's car to talk to Aykroyd and deliver the heroin. Aumuller told them the heroin "was fire," which Connaughton understood to mean that it was very potent. Nevius gave the money to Aykroyd. Aykroyd and Aumuller exchanged the money for the *1139 drugs. Aykroyd and Aumuller went into the store to get change and buy water. Aumuller and the woman then left in their car.
Aykroyd and Nevius then shot up the heroin in the car. Nevius fell asleep. Connaughton drove them back to Nevius's apartment. Connaughton and Aykroyd left Nevius sleeping in the car and went into the apartment where they shot up. About twenty minutes later, they went out to check on Nevius and found he was not breathing and had no pulse. They brought him into the apartment and tried to perform CPR. Nevius vomited while they were trying to revive him, but he was otherwise nonresponsive. Howlett arrived while they were trying to resuscitate Nevius, but Howlett did not stay long. Aykroyd and Connaughton left Nevius's apartment to drive to Connaughton's house and, after about fifteen minutes, Aykroyd called the paramedics from a pay phone.
Police officers contacted Connaughton after the 911 call occurred. Initially he lied and told police that they had found Nevius dead in his apartment. Connaughton tried to cover up his involvement because he was on probation at that time. He later confessed and helped officers locate the needles, which had been thrown in the trash at Nevius's house.
Aykroyd's testimony differed from that of Connaughton as to the details of the drug transaction. Aykroyd testified that he knew Aumuller for about a year prior to March 9, 2002. They had met working at a telemarketing company. Aumuller drove a red Nissan 200SX car and had a girlfriend named Heather Crouse. Aykroyd met with Nevius and Connaughton at Nevius's house in the afternoon on March 9. They decided to get some heroin. Aykroyd used his cell phone to page Aumuller, and Aumuller returned the call. Aykroyd conveyed to Aumuller that he wanted to buy a half gram of heroin. Aumuller indicated that he was going to Tampa to "re-up," which Aykroyd understood to mean that he planned to get more heroin.
Aykroyd paged Aumuller again a few hours later, and this time Crouse called back. Aykroyd and Crouse set a location, a gas station, where the drug transaction would occur. He also asked Crouse to sell him some Ecstasy. Aykroyd, Connaughton, and Nevius waited at the gas station for about an hour before Crouse and Aumuller arrived in Aumuller's red Nissan. Crouse was driving. She parked next to Aykroyd so that Aumuller, who was sitting in the passenger seat of the Nissan, could talk to Aykroyd, who was sitting in his driver's seat. They said hello to each other from their vehicles. Crouse got out of the car and went up to Aykroyd's window to exchange the money for the drugs. Nevius gave the money to Aykroyd because Nevius was buying the drugs, and Aykroyd gave the money to Crouse. Aumuller never got out of his car. Crouse went into the store to get change. Crouse and Aumuller drove away.
Aykroyd handed the heroin to Nevius, who proceeded to make "his fix" and hand the bag back to Aykroyd. Aykroyd noticed that Nevius took a lot more than what would be normal. They both put the heroin in a spoon, mixed it up, put it in a syringe, and shot it into their arms. Aykroyd blacked out in the driver's seat. Connaughton drove them to Nevius's house. Nevius fell asleep on the way. Aykroyd and Connaughton left Nevius sleeping in the car and went into the house to shoot up more heroin.
An unknown time later, while they were under the influence of heroin, Aykroyd and Connaughton went out and found Nevius slouched over, lifeless. They brought *1140 Nevius into the house, laid him on the floor, and attempted to resuscitate him. After a while, Nevius started to vomit, which they thought was a sign he was reviving. They sat him up while he vomited for a few minutes. They tried to perform CPR again, but Nevius showed no sign of life. Jason Howlett came in briefly as they were trying to revive Nevius. After Howlett left, Aykroyd and Connaughton left together to go to Connaughton's home in Dunedin. They believed that Nevius was dead at that point and they left him at the house without calling for assistance. From Connaughton's house, Aykroyd walked to a pay phone and placed a 911 call. Then Aykroyd went home. The next day, Aykroyd paged Aumuller, and Crouse called back. Aykroyd told Crouse that Nevius had overdosed and died.
Jason Howlett testified that on March 9 he spent the day with other friends. Early the next morning, at about 2 a.m., he stopped by Nevius's house. He saw Aykroyd's and Connaughton's cars out front. He knocked on the door and waited for someone to answer. When he went inside, he saw Nevius on the floor. Howlett thought that Aykroyd, Connaughton, and Nevius were playing a joke on him. He then realized that Aykroyd was doing CPR and the situation was serious. Nevius was pale and cold and had no pulse. Howlett realized that Nevius was dead. Howlett told the others to call the police and paramedics. He asked them to call him to let him know what happened. He then left the house and drove around. Between thirty and forty-five minutes later, Connaughton called Howlett. Howlett met Aykroyd and Connaughton at Connaughton's house. Howlett forced the other two to walk to the pay phone and make the 911 call.
Officer Quinones testified that he was sent to investigate the overdose at 3:21 a.m. Upon arriving at the house, he found a white male slouched over and nonresponsive. The paramedic who arrived testified that Nevius was pronounced dead at 3:33 a.m. He appeared to have been dead for a couple of hours.
Detective Faugno testified that he interviewed Connaughton. From that interview, he was able to locate hypodermic needles and drug paraphernalia in a trash can. The detective also interviewed Aykroyd and Howlett, as a result of which the detective contacted Aumuller.
Detective Faugno interviewed Aumuller after reading him his rights. Aumuller said that Crouse was his girlfriend and that he knew Aykroyd. He said that on the night in question Aykroyd wanted to buy heroin and Ecstasy from him. Aumuller recalled having to make a special trip to get the pills separate from the heroin. He said that he had to put Aykroyd at the bottom of the list for that reason. Aumuller said that he bought the drugs from someone in Tampa and that he called Aykroyd back with a location for the transaction. Aumuller arrived at the gas station after 10:00 that night and sold Aykroyd the drugs. Later, Aykroyd called to tell Aumuller that someone had overdosed on the drugs. Aumuller told Aykroyd that he should have called when the problem happened because he could have helped save Nevius. He had seen people overdose before and had helped save them.
A forensic toxicologist for the medical examiner's office examined autopsy samples from Nevius and testified that the urine sample indicated the presence of caffeine, nicotine, cocaine, marijuana, and heroin. The blood sample showed the presence of heroin in a level consistent with the range for accidental overdose. According to the toxicologist, cocaine did not play a role in the cause of death in this case.
*1141 The associate medical examiner who performed the autopsy testified that she determined from the toxicology reports that the cause of death was heroin toxicity. Nevius may have been alive when CPR was performed. The doctor could not determine the amount of heroin injected or the time when it was injected. The doctor did not know if improper CPR attempts could have contributed to the death.
Aumuller testified that he did not have any conversations with Aykroyd on March 9, 2002. The pager belonged to Crouse, his girlfriend, but Aumuller had used it on occasion. Aumuller was addicted to heroin at the time of the incident, and Crouse obtained the drug for him. Crouse picked him up from work that day and drove him to Tampa, where she obtained the heroin. Aumuller never met the person who supplied the drug to Crouse. Crouse arranged the meeting with Aykroyd. When they arrived at the gas station, Aumuller was high, and he did not know why they were stopping. Crouse asked him to speak with Aykroyd and sell him the drugs.
Aumuller got out of the car with the drugs to speak with Aykroyd and make the transaction. When he realized there were others in Aykroyd's car, Aumuller returned to his car because he was not sure what was going on. Aumuller knew Aykroyd, but not the other men with him. He told Crouse that Aykroyd needed change and that he did not feel comfortable with the situation. He told her that he wanted nothing to do with the situation. Crouse was upset because she would have to return money to others, and she jumped out of the car to stop Aykroyd from leaving. She went to get change and completed the transaction with Aykroyd. Aumuller said he had nothing to do with the transaction.
During the charge conference, the parties disagreed on whether the jury instruction for the murder charge should include mention of intervening factors.[2] Aumuller submitted a written request for an instruction, which provided, in part: "[T]he State must prove that there was no break in the chain of circumstances beginning with the felony and ending with the murder. If there is a break in the chain of events between the felony and the killing, the felony murder rule does not apply." The State opposed the requested instruction and took the position that the jury instructions should not mention "intervening cause" because it was a confusing term and it was not applicable to this case. The trial court ruled that "to the extent [the requested instruction] talks about breaking the chain of events, that is inappropriate to this case."
The instruction given to the jury relating to causation provided:
[T]he State must prove the following three elements beyond a reasonable doubt:
One, Jairon Nevius is dead.
Two, the death resulted from the unlawful distribution of any substance controlled under Florida Statute 893.03(1) by Michael Aumuller, a person 18 years of age or older.
Three, the drug was the proximate cause of the death of Jairon Nevius.
. . . .
The State is required to prove the heroin was the proximate cause of the death. This means you must find that the heroin was the primary or moving cause in producing the death, and without it, the death would not have happened.
*1142 Aumuller argues on appeal that there was some evidence to support his theory of a break in the causal link between his involvement and the death of Nevius, which would support the giving of his requested instruction. The State argues that there is no authority for Aumuller's proposed instruction and there was no evidence to support the instruction.
"A trial court's decision on the giving or withholding of a proposed jury instruction is reviewed under the abuse of discretion standard of review." Bozeman v. State, 714 So.2d 570, 572 (Fla. 1st DCA 1998). A "[d]efendant is entitled to have the jury instructed on the rules of law applicable to his theory of defense if there is any evidence to support such instructions." Hooper v. State, 476 So.2d 1253, 1256 (Fla.1985) (citing Smith v. State, 424 So.2d 726 (Fla.1982); Palmes v. State, 397 So.2d 648 (Fla.1981)). "The trial judge should not weigh the evidence for the purpose of determining whether the instruction is appropriate." Smith, 424 So.2d at 732.
The State was required to show that the heroin was the proximate cause of the death. In addition, the State was required to prove linkage or causation between the distribution and the death. The jury was properly instructed that the State must prove that "the death resulted from the unlawful distribution of any substance." This instruction was adequate.
In support of his assertion that he was entitled to the requested instruction, Aumuller relies on this court's statements in Allen v. State, 690 So.2d 1332 (Fla. 2d DCA 1997), which addresses causation in the felony murder context. Allen concerns the sufficiency of evidence for third-degree murder based on the underlying felony of grand theft of a motor vehicle. The defendant was driving a stolen car when it crashed into the car driven by the decedent. Id. at 1333. In reversing the third-degree murder conviction, this court determined that there was a break in the chain of circumstances beginning with the felony and ending with the killing, and the defendant was not engaged in the commission of the grand theft at the time of the car crash. Id. at 1334.
In contrast to the third-degree murder offense at issue in Allen, the first-degree murder offense here has been described as "an unusual form of felony murder." Pena v. State, 829 So.2d 289, 294 (Fla. 2d DCA 2002). The unusual characteristics of the offense were discussed in Pena:
The offense described in section 782.04(1)(a)(3), however, is an unusual form of felony murder. The defendant does not need to intend an act of homicide. In fact, the defendant does not even need to possess knowledge of the drug overdose or to be present when it occurs. If the defendant unlawfully distributes an illegal drug and the distribution results in a death caused by the drug, then the defendant is guilty of first-degree murder under section 782.04(1)(a)(3).
829 So.2d at 294.
Here, the medical evidence showed that the cause of death was heroin toxicity. When the conflicting evidence surrounding the actual distribution of the heroin is taken in a light favorable to Aumuller, the roles of Aykroyd and Crouse in providing the heroin to Nevius do not serve as intervening acts to merit the requested instruction. This is so because a person commits the offense by acting as a distributor in the drug distribution chain, and it is irrelevant that other persons are also involved in the chain. See Martin v. State, 377 So.2d 706 (Fla.1979). We therefore conclude that because there was no evidence to support an intervening cause theory, the *1143 trial court's denial of the requested instruction was not an abuse of discretion.
Affirmed.
CASANUEVA and STRINGER, JJ., Concur.
NOTES
[1] Section 782.04(1)(a)(3), Florida Statutes (2001), provides:

The unlawful killing of a human being:. . . . Which resulted from the unlawful distribution of any substance controlled under s. 893.03(1) . . . by a person 18 years of age or older, when such drug is proven to be the proximate cause of the death of the user, is murder in the first degree and constitutes a capital felony, punishable as provided in s. 775.082.
[2] There is no standard jury instruction for first-degree murder by drug distribution.