# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### May 21, 2013 Session

## STATE OF TENNESSEE v. PHILLIP PACK

### Appeal from the Criminal Court for Campbell County
### No. 15901      E. Shayne Sexton, Judge

---

### No. E2011-02680-CCA-R3-CD - Filed September 27, 2013

---

The defendant, Phillip Pack, appeals from his Campbell County Criminal Court jury conviction of second degree murder, claiming that the evidence was insufficient to support his conviction, that newly discovered evidence established his innocence, that the trial court erred by admitting certain evidence, and that the prosecutor made inappropriate remarks during closing argument. Because the evidence adduced at trial was insufficient to support the defendant's conviction of second degree murder, the conviction is reversed, and the charge is dismissed.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Reversed and Dismissed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and CAMILLE R. MCMULLEN, J., joined.

Gregory P. Isaacs and Andrea B. Mohr (on appeal); and Keith Hatfield (at trial), Knoxville, Tennessee, for the appellant, Phillip Pack.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William Paul Phillips, District Attorney General; and Michael O. Ripley and Leif Jeffers, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

A Campbell County Criminal Court jury convicted the defendant of second degree murder based upon his providing methamphetamine to the victim, Jayne Love, whose skeletal remains were found near Eagle Bluff rock in Campbell County in September 2008.

At trial, Evelyn Herman, the victim's probation supervisor, testified that on

October 10, 2006, she began supervising the victim's probation for convictions of passing worthless checks and driving under the influence. Ms. Herman described the victim as "compliant" and noted that she last saw the victim on April 30, 2008, when the victim reported as scheduled. Ms. Herman said that the victim missed a scheduled meeting on May 1, 2008, which was unusual.

David Madison testified that while hunting on Eagle Bluff on September 10, 2008, he discovered human skeletal remains "spread out" in the woods. Mr. Madison did not disturb the remains and telephoned the sheriff's department immediately. Later that same day, he accompanied officers to the area.

Lester Gaylor testified that while hunting below Eagle Bluff rock on March 23, 2009, he discovered "a pair of shoes and stuff" along with "a purple Crown Royal bag" that contained the victim's driver's license and other personal items. Mr. Gaylor said that he put the items back into the bag, put the bag back where he had found it, and contacted police. He accompanied officers to the area that same day.

Campbell County Sheriff's Department Detective Brandon Elkins testified that he accompanied Messrs. Madison and Gaylor to Eagle Bluff following their respective discoveries. Detective Elkins recalled that it took officers approximately 18 minutes to reach the site from the area where people generally park at Eagle Bluff rock. At the location of the skeletal remains, officers also found clothing and a necklace. Detective Elkins said that officers did not disturb the remains but instead contacted the medical examiner and Doctor Lee Jantz of the University of Tennessee Forensic Anthropology Team. Doctor Jantz and her team arrived on the same day as Mr. Madison's discovery. Detective Elkins assisted Doctor Jantz by obtaining the victim's dental records.

Detective Elkins testified that at the location discovered by Mr. Gaylor, officers found tennis shoes, one of which had a sock inside of it, along with the faceplate of an aftermarket compact disc player, and a Crown Royal bag. Inside the bag, he found the victim's driver's license, a set of keys, a pair of women's underwear inside a sealed baggie, and other miscellaneous items. Mr. Gaylor's discovery, he said, was "a little less than a mile" from where Mr. Madison found the skeletal remains.

Doctor J. Randall Pearce, a forensic odontologist and consultant to the University of Tennessee Anthropology Team, testified that after being contacted by Doctor Jantz, he x-rayed the skull discovered by Mr. Madison and compared the x-rays to the victim's dental records provided by the victim's dentist. Focusing particularly on three teeth in the upper right quadrant that had extensive fillings, Doctor Pearce was able to conclude that the skull belonged to the victim. He verified his findings by comparing the maxillary

sinus and the root pattern of the teeth on the skull with those on the victim's x-rays.

Doctor Lee Jantz, coordinator of the Forensic Anthropology Center at the University of Tennessee, testified that she traveled with her team to Eagle Bluff rock on September 10, 2008, to examine the skeletal remains discovered by Mr. Madison. Doctor Jantz said that "based upon the condition of the remains, the slight greasy texture and the slight odor and the time of the year," she estimated that the remains were "between three and six months postmortem," placing the victim's time of death between March and June 2008. Doctor Jantz explained that she could not determine the cause of the victim's death because "[a]ll the soft tissue evidence [was] gone" but did say that she "did not see any evidence of trauma that's on the skeletal remains."

Forensic testing conducted on the women's underwear discovered inside the sealed baggie established the presence of deoxyribonucleic acid ("DNA") belonging to both the victim and the defendant. None of the other items tested, including the victim's clothing and shoes, bore evidence of blood, semen, or other bodily fluids. Both of the forensic scientists who testified at the defendant's trial clarified that they were not asked to make any finding relative to the cause of the victim's death.

Twenty-one-year-old Michael Wilson testified that he had known the defendant for approximately two years at the time of the 2010 trial and that he was with the defendant and the victim on the night that she died. Mr. Wilson testified that on a day in May 2008, the defendant, the defendant's brother, Russell Pack, and the victim came to the Grantsboro residence of Mr. Wilson's friend and "asked [him] if [he] wanted to ride with them." Mr. Wilson said that he agreed "[j]ust to get out of the house." He said that at that time he had "hung out with [the defendant] a couple times before." After the trio picked up Mr. Wilson sometime after dark, they "rode around, then . . . went up on the rock." They traveled in the defendant's "little green Ford Ranger," and Mr. Wilson rode in the back of the truck while the victim rode in the cab between the defendant and his brother. Mr. Wilson said that the group's purpose in traveling to Eagle Bluff rock was to "[j]ust do some Meth." Mr. Wilson said that he had consumed "[t]hree or four" Oxycontins earlier in the day and, as a result, "was pretty messed up."

Mr. Wilson testified that after they arrived at Eagle Bluff rock, the victim said "something about wanting to do a shot of dope." At that point, the defendant asked Mr. Wilson to "hand him the bottle of water," and Mr. Wilson "handed it to him through his window, [and the defendant] fixed a shot of dope up." He described what he meant by "fixed a shot of dope": "Poured . . . the dope into a spoon, he drew back water in the syringe and put it on it – drew it back. And then I don't know . . . if she shot it up herself or what." Mr. Wilson testified that the victim "done" the shot prepared by the defendant but said that he did

-3-

not see the victim inject herself and did not see anyone give her an injection.

Mr. Wilson said that he was familiar with the process for preparing methamphetamine to be injected because he had injected methamphetamine on one previous occasion. Mr. Wilson said that he did not consume any methamphetamine on that night but acknowledged that he was "pretty messed up" after ingesting the Oxycontin.

Mr. Wilson said that the methamphetamine had come from the defendant, speculating, "I guess he had it in his pocket." He said that the drug was contained in a baggie and that the defendant prepared the injection in "a teaspoon." Mr. Wilson estimated the amount of drugs included in the preparation, saying, "I'm gonna say it was at least a gram of Meth." Mr. Wilson said that the amount, which filled the spoon, was atypically large. He stated that when he had injected methamphetamine, he had only used "between a quarter and a half a gram." He testified that he had not seen anyone inject that large an amount of methamphetamine before. Mr. Wilson claimed that he told the defendant "that looked like an awful lot of dope," and the defendant responded, "'She can handle it.'"

Mr. Wilson said that he "remember[ed]" the victim "saying that her arm was numb and her chest was hurting" sometime after he saw the syringe prepared. At that point, according to Mr. Wilson, the defendant "told her if she was gonna be getting sick to get out of his vehicle." Mr. Wilson said that he did not hear the victim say anything else. He said that the defendant, his brother, and the victim then exited the truck and "walked off into the woods." Mr. Wilson said that he did not accompany the trio into the woods and instead, "sat in the back of the truck the whole time."

Mr. Wilson testified that the defendant and his brother returned "30, 45 minutes" later, and the victim was not with them. He said that the defendant's brother told him to get into the front of the truck, and they drove away. He recalled that the defendant's brother told him that if he "ever said anything about it that [he'd] lay up there, too." Mr. Wilson said that on the way down the mountain, they stopped, and the defendant "got out and picked up a duffel bag" that he placed in the bed of the truck. The men took Mr. Wilson "back to Grantsboro." He said that they were on the mountain for approximately "an hour and 15 minutes."

Mr. Wilson testified that he had seen the defendant "[a] few times" "everywhere" after the day in question, but the two had not discussed the events of that evening. He said that he had "recently" been in an altercation with the defendant at "B.J. Lawson's trailer," where Mr. Wilson was "hanging out with some girl." Mr. Wilson stated that when the defendant arrived, Mr. Wilson and the girl started to leave when a man named Eddie LeMarr struck him two times. According to Mr. Wilson, after Mr. LeMarr struck him,

-4-

the defendant said something like "[t]hat's what I get for going to Court against him the 24th" and struck him a single time. Mr. Wilson said that he suffered a black eye as a result of the blows inflicted by the defendant and Mr. LeMarr.

During cross-examination, Mr. Wilson reiterated that he had consumed three or four Oxycontins before getting into the defendant's truck and added that he consumed another Oxycontin after returning home later that night. Mr. Wilson denied telling other people that he had gone to Eagle Bluff rock with the victim, Bobby Evans, and Russell Pack and denied being in possession of the victim's wallet at any time. He acknowledged that he had never discussed the events with the defendant. Mr. Wilson conceded that he had a criminal record and that he was aware that one could trade testimony for favorable treatment. He also acknowledged that he had not been charged with any offense related to the victim's death.

Mr. Wilson said that he had provided "[t]hree or four" recorded statements to police, beginning with a statement he provided on September 26, 2008. Mr. Wilson confirmed that he did not see the victim inject the drugs.

Detective Elkins testified that he interviewed the defendant on September 17, 2008. During that interview, the defendant provided a statement that was not recorded in writing or by audio or video recording. According to Detective Elkins, the defendant said that he had last seen the victim when "he was running from the police."

> What he told me was that he and Jayne were in his green Ford Ranger heading out towards Towe String Road, and he believed that he saw a cop turn around on him so he accelerated and tried to get away. He and [the victim] pulled up into the church parking lot. . . . and kind of hid behind the church with the vehicle. They both got out. He told me that [the victim] had the face to his CD player and the key to his truck. He said that he took off running, and he actually hid behind Travis Hollifield's house . . . . And at that point, he said that was the last time he had seen [the victim].

Detective Elkins said that he interviewed the defendant a second time on December 10, 2008, following his indictment and arrest for the victim's murder. During that interview, the defendant provided a written statement:

> Me, Dickie, Russell and [the victim] went to Gary Carringer's house in Jacksboro. We were partying and decided to leave.

We drove up to the rock in my truck around dark. I was driving, Russell was in the passenger seat, [the victim] was in the middle, and Dickie was in the back of the truck. We went to Eagle Bluff rock and got out. We were using dope. We walked into the woods. I got worried about my truck and went back. After a while, I got a gut feeling I needed to leave when they didn't come back to my truck. I left the mountain after a while. This is all I know about this. I don't know any facts of foul play, but I suspect it.

Detective Elkins testified that within an hour of providing the second statement, the defendant provided a third, typewritten statement:

I was on Towe String Road and I passed the county cop at 65 miles an hour. He turned around to catch me, I gassed it and ran behind the first church I came to. It is right before Hollifield Road. I parked beside the church where my truck was hid. I looked . . . at [the victim]. Before I could say anything, [the victim] said, do what you gotta do. I ran through the field and came out in front of Travis Hollifield's house. [The victim] came walking across the field. She went to the front door and knocked, she didn't get an answer. [The victim] started to go into the house anyway. I went up the hill and crossed the road, then walked through the woods. It brought me out on Towe String Road at the steep curve. I walked the tree line back to town and called my dad from the Shell Station next to Walgreens, and he came got me. My dad took me back to get my truck later that night. That day was the last time I ever saw [the victim]. I told them the other story because that's all they wanted to hear and believed anyway.

Detective Elkins testified that he had taken "two or three" statements from Mr. Wilson and that "the statements have been consistent" with the only "inconsistency" coming "on the act of leaving the scene or the area of the truck in the very beginning." He said that he had interviewed a number of other people in conjunction with the investigation.

Following Detective Elkins' testimony, the State rested. The defendant moved for a judgment of acquittal, arguing that the State had failed to prove that the defendant actually distributed methamphetamine to the victim or that the proximate cause of the victim's death was ingestion of methamphetamine provided to her by the defendant. The

trial court denied the motion, ruling that "looking at the proof in a light most favorable to the State, the Jury could return a verdict of guilty."

Kay Mills testified on behalf of the defendant that on an occasion in September 2008, Mr. Wilson approached her car and asked if she would give him a ride. She agreed. She said that as they were driving, Mr. Wilson told them that "he was running from the law, him and [the defendant] and Bobby [Evans] . . . that Phillip got pulled over at Eagle Market." Mr. Wilson told her and her companions that he, the defendant, and Mr. Evans had been with the victim "shooting up" methamphetamine when the victim "shot up and . . . quit breathing, and . . . they threw her out on a rock."

During cross-examination, she confirmed that Mr. Wilson told her that the defendant had injected the victim with methamphetamine. She agreed that she told Detective Elkins that Mr. Wilson said that the defendant killed the victim.

Chris Thornsbury testified that he was with Kay Mills when she agreed to provide Mr. Wilson a ride. He said that Mr. Wilson told them that he, the defendant, and Bobby Evans had been with the victim when she overdosed, and "they got rid of her." During cross-examination, Mr. Thornsbury said that Mr. Wilson told them that the defendant prepared the injection but said that he did not hear Mr. Wilson say that the defendant had injected the drug into the victim.

Leona Mills testified that she was driving with Kay Mills and Mr. Thornsbury when they encountered Mr. Wilson and agreed to give him a ride. Mr. Wilson told them that he was running from police because he, the defendant, and Bobby Evans had provided "that Loveday girl" with "enough Methamphetamine to kill her." During cross-examination, she acknowledged that she overheard Mr. Wilson say that the defendant had injected the drugs into the victim and had killed her.

At the conclusion of this proof, the defense rested. Based upon the foregoing evidence, the jury convicted the defendant as charged of second degree murder.

Following the denial of his timely but unsuccessful motion for new trial, the defendant filed a timely notice of appeal. In this appeal, the defendant challenges the sufficiency of the convicting evidence, the admission of certain evidence, and the propriety of certain remarks made by the prosecutor during closing argument. We consider each claim in turn.

*I. Sufficiency*

The defendant contends that the evidence was insufficient to support his conviction because the State failed to establish that the defendant distributed methamphetamine to the victim or that ingestion of methamphetamine was the proximate cause of the victim's death. The State contends that the evidence was sufficient. We agree with the defendant.

We review the defendant's challenge to the sufficiency of the evidence mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[s]econd degree murder is . . . [a] killing of another that results from the unlawful distribution of any Schedule I or Schedule II drug, when the drug is the proximate cause of the death of the user." T.C.A. § 39-13-210(a)(2) (2006). "'Distribute' means to deliver other than by administering or dispensing a controlled substance." T.C.A. § 39-17-402(9). "Proximate cause is that which, in a natural and continual sequence, unbroken by any new, independent cause produces the injury, and without which the injury would not have occurred." *Gray v. Brown*, 217 S.W.2d 769, 771 (Tenn. 1948).

To obtain a conviction under Code section 39-13-210(a)(2), the State must first prove that the defendant distributed a Schedule I or Schedule II controlled substance, in this case methamphetamine, *see* T.C.A. § 39-17-408(d)(2) (designating "Methamphetamine, its salts, isomers, and salts of its isomers" as a Schedule II controlled substance).

In this case, the only proof that the substance in the defendant's possession was

-8-

methamphetamine came from Mr. Wilson, who testified that he saw the defendant in possession of methamphetamine. Mr. Wilson stated that he was familiar with the drug, having injected it once before, and that the group's purpose in traveling to Eagle Bluff rock was to "get high" on methamphetamine. Our courts have previously ruled that the testimony of trained law enforcement officers is sufficient to establish the identity of marijuana beyond a reasonable doubt when corroborated by field testing, *see State v. Anderson*, 644 S.W.2d 423, 424 (Tenn. Crim. App. 1982); *State v. Hill*, 638 S.W.2d 827, 830 (Tenn. Crim. App. 1982); when corroborated by a confession, *see State v. Doelman*, 620 S.W.2d 96, 98 (Tenn. Crim. App. 1981); or when accompanied by incriminating circumstantial evidence such as the defendant's implicit or explicit admission or the discovery of drug paraphernalia commonly associated with marijuana use, *see, e.g.*, *State v. Mikel Primm*, No. 01C01-9712-CC-00571 (Tenn. Crim. App., Nashville, Dec. 9, 1998); *State v. William Franklin Townsend, III*, No. 01C01-9306-CR-00175 (Tenn. Crim. App., Nashville, July 14, 1994). *See State v. White*, 269 S.W.3d 903, 906-07 (Tenn. 2008). In the present case, we conclude that the jury could have inferred from the circumstances, namely that the defendant mixed the substance with water and prepared it for intravenous injection and that the defendant admitted that the group was "doing dope," that the substance was, in fact, methamphetamine.

That being said, the evidence is less clear that the victim actually used the drug. Although Mr. Wilson testified that the defendant prepared the substance for intravenous injection by mixing it with water and drawing it into a syringe, he adamantly maintained that he did not see the victim inject the drug. Nor did he see the defendant inject the drug into the victim. *Pena v. State*, 901 So. 2d 781, 782-83 (Fla. 2005) (proof of ingestion sufficient when a witness testified that he and the victim injected the heroin that led to the victim's death); *Aumuller v. State*, 944 So. 2d 1137, 1139 (Fla. Dist. Ct. App. 2006) (proof of ingestion sufficient when victim and witness "put the heroin in a spoon, mixed it up, put it in a syringe, and shot it into their arms"); *Hulme v. State*, 544 S.E.2d 138, 140 (Ga. 2001) (proof of ingestion sufficient when defendant told a witness that "she had given [the victim] 20 to 25 milligrams of methadone" and corresponding methadone level in the victim's blood was confirmed by autopsy); *State v. Hano*, 938 So. 2d 181, 189 (La. Ct. App. 2006) (proof that victim ingested drug that lead to his death sufficient when a witness testified that she and the victim "consumed two of the four pills, taking a portion by mouth and inhaling the rest"); *State v. Parlee*, 703 S.E.2d 866, 870 (N.C. Ct. App. 2011) (proof of ingestion sufficient when a witness testified that he and the victim split an Oxymorphone pill sold to them by the defendant and autopsy showed a lethal level of the drug in the victim's blood). We note that the testimony of the Mses. Mills and Mr. Thornsbury on this point was far more damaging to the defendant than was Mr. Wilson's testimony. Kay and Leona Mills, in particular, testified that Mr. Wilson told them that the defendant had injected the victim with methamphetamine. All three witnesses testified that Mr. Wilson said that the defendant had

killed the victim.

Even if we determined that the jury could have inferred that the victim injected the drug from Mr. Wilson's testimony that she complained of numbness in her arm and chest pain shortly after Mr. Wilson saw the defendant prepare the injection and the testimony of the three defense witnesses, we must hold that the State failed to establish that the injection of methamphetamine was the proximate cause of the victim's death. "Regarding the proximate cause inquiry," our supreme court has "adopted a three-pronged test": (1) the "conduct must have been a 'substantial factor' in bringing about the harm being complained of;" (2) "there is no rule or policy that should relieve the wrongdoer from liability because of the manner in which the negligence has resulted in the harm;" and (3) "the harm giving rise to the action could have reasonably been foreseen or anticipated by a person of ordinary intelligence and prudence." *Wilson v. Americare Sys.*, ___ S.W.3d ___, No. M2011-00240-SC-R11-CV, slip op. at 7-8 (Tenn. Feb. 25, 2013) (citing *Hale v. Ostrow*, 166 S.W.3d 713, 719 (Tenn. 2005) (quoting *Haynes v. Hamilton Cnty.*, 883 S.W.2d 606, 612 (Tenn. 1994))). Our supreme court has explained:

> "Causation (or cause in fact) is a very different concept from that of proximate cause. Causation refers to the cause and effect relationship between the tortious conduct and the injury. The doctrine of proximate cause encompasses the whole panoply of rules that may deny liability for otherwise actionable causes of harm." Thus, proximate cause, or legal cause, concerns a determination of whether legal liability should be imposed where cause in fact has been established. "Cause in fact, on the other hand, deals with the 'but for' consequences of an act. 'The defendant's conduct is a cause of the event if the event would not have occurred but for that conduct.'"

*Kilpatrick v. Bryant*, 868 S.W.2d 594, 598 (Tenn. 1993) (citations omitted).

In the present case, no witness testified regarding the cause in fact of the victim's death. Based upon the proof presented at trial, we know that the victim died sometime between April 30, 2008, and June 2008 and that on a date in May she accompanied the defendant, his brother, and Mr. Wilson to Eagle Bluff rock, where she may or may not have injected methamphetamine prepared by the defendant before walking into the woods with the defendant and his brother. Although Mr. Wilson testified that the victim did not return to the truck with the men, no proof established that the unspecified day in May was actually the last day of the victim's life. Most importantly, however, the State presented absolutely no proof that the victim's death was caused by the injection of methamphetamine.

-10-

We have examined *State v. Shepherd*, 862 S.W.2d 557 (Tenn. Crim. App. 1992), in which this court affirmed the defendant's conviction of second degree murder. Although factually similar in that the victim's remains were discovered in a wooded area with no apparent cause of her death, this case differs markedly from *Shepherd*. In *Shepherd*, the defendant gave more than one statement implicating himself in the minor victim's drug overdose, admitting that he took the victim to get the "dope" that they both ingested before going to sleep. *State v. Shepherd*, 862 S.W.2d 557, 559-60 (Tenn. Crim. App. 1992). Shepherd also admitted that he buried the victim's body in a shallow grave after realizing that she had died. *Id.* After his arrest, Shepherd escaped from jail and fled to Canada, where he lived under a fake identity for 10 years. *Id.* at 560. Shepherd's admissions matched the forensic evidence discovered at the scene. Several witnesses testified that they had seen the defendant and the minor victim drinking alcohol and taking drugs. *Id.* at 560-62. Forensic testing of the victim's brain tissue established the presence of the drug doxepin, a drug that was "dangerous when mixed with alcohol." *Id.* at 563. The defendant's psychiatrist testified that he had prescribed the defendant doxepin shortly before the victim's death. *Id.* That same physician testified that taking doxepin along with alcohol and other drugs "'would be a disaster.'" *Id.* Of utmost importance, however, Shepherd was not charged with second degree murder based specifically on distributing a Schedule I or II controlled substance to the victim.

Unlike the vast majority of homicide cases, which do not require that the State establish a specific mode of death as an element of the offense, the State was required in this case to prove that use of methamphetamine was the proximate cause of the victim's death. The State failed, however, to prove any cause in fact of death for the victim, much less that she died as a result of intravenous injection of methamphetamine. As noted, "proximate cause . . . concerns a determination of whether legal liability should be imposed *where cause in fact has been established*." *Id.* (emphasis added). Because the State failed to establish the cause in fact of the victim's death, it likewise failed to prove that the proximate cause of the victim's death was the defendant's provision of methamphetamine.

Recently, in *State v. Farmer*, 380 S.W.3d 96 (Tenn. 2012), our supreme court concluded that the evidence was insufficient to support a conviction of aggravated assault because the State failed to prove that the injury inflicted by the defendant carried a substantial risk of death, as required by statute. The court emphasized that "[b]ecause in many cases a layperson does not have the necessary medical knowledge to determine whether a particular injury involves a substantial risk of death, expert medical testimony is frequently of critical importance in establishing that fact." *State v. Farmer*, 380 S.W.3d 96, 102 (Tenn. 2012) (citations omitted). Writing separately to highlight that "the necessity of presenting expert medical evidence regarding whether a particular injury involves a 'substantial risk of death' is more pronounced in a criminal proceeding than it is in analogous civil proceedings,"

Justice Koch observed that "jurors in criminal cases have no greater expertise with regard to medical matters than jurors in civil cases. In addition, the State must prove every ingredient of the offense beyond a reasonable doubt." *Farmer*, 380 S.W.3d at 103-04 (Koch, J., concurring). Justice Koch concluded that "except for injuries that are either so serious or so trivial that a lay person will understand that they either do or do not involve a substantial risk of death, expert testimony will, in the words of [evidence rule] 702, 'substantially assist the trier of fact to understand the evidence or to determine' whether a particular injury involves a 'significant risk of death.'" *Id.*

In our view, the need for expert medical testimony to establish cause of death in a homicide case when the State must establish beyond a reasonable doubt that the proximate cause of death was the ingestion of a Schedule I or II controlled substance is even stronger than in an aggravated assault case. In many homicide cases, the victim's injury is so obvious that expert testimony as to cause of death might not be necessary. *See, e.g.*, *State v. James Drew Freeman, Jr.*, No. M2011-00184-CCA-R3-CD (Tenn. Crim. App., Nashville, May 9, 2012) (where victim's body was discovered with an obvious shotgun wound to the back and tire tracks on her legs). This is particularly true because, as noted above, other forms of homicide do not require that the killing be committed via a particular mode. When the State must establish that the proximate cause of the victim's death was the use of a Schedule I or II controlled substance, however, expert medical proof will almost always be necessary to establish the cause in fact of the victim's death. Our supreme court has observed that in a civil suit for wrongful death, liability cannot be assigned unless the plaintiff establishes the cause in fact of death. *Kilpatrick*, 868 S.W.2d at 602 (citing *White v. Methodist Hosp. South*, 844 S.W.2d 642, 648-49 (Tenn. Ct. App. 1992)). This showing is made, more often than not, via expert medical testimony. Surely, when the defendant's liberty is at stake and the State is required to prove beyond a reasonable doubt that the defendant's act in providing the victim with a Schedule I or II controlled substance was the proximate cause of the victim's death, the State ordinarily must prove the cause in fact of the victim's death via expert medical testimony.

In surveying those cases from other jurisdictions involving similar statutes, we found universal use of expert medical proof to establish that consumption of a controlled substance was the proximate cause of the victim's death. In *Aumuller*, the court, in discussing the cause of the victim's death, observed that "[a] forensic toxicologist . . . testified that . . . . [a] blood sample showed the presence of heroin in a level consistent with the range for accidental overdose. According to the toxicologist, cocaine did not play a role in the cause of death in this case." *Aumuller*, 944 So. 2d at 1140. In *Chua v. State*, 710 S.E.2d 540 (Ga. 2011), expert medical testimony established "that the methadone in [the victim]'s blood alone was sufficient to kill him. . . . [T]he methadone Chua unlawfully distributed to [the victim] was such that it 'could have been lethal without regard to other

drugs the victim might have consumed.'" *Chua v. State*, 710 S.E.2d 540, 548 (Ga. 2011). In *Hulme*, "[a] forensic toxicologist testified that she found methadone, propoxyphene . . . and norpropoxyphene . . . in the victim's system, and that the methadone and norpropoxyphene were at lethal levels. . . . Moreover, the State's medical examiner testified that the methadone, in combination with the propoxyphene, caused [the victim]'s death." *Hulme*, 544 S.E.2d at 140. In *Hano*, medical testimony established "that the methadone was the direct cause of [the victim]'s death. All three medical experts agreed that . . . it was the presence of methadone and benzodiazepines that gave rise to the hypoxic brain injury that ultimately caused his death." *Hano*, 938 So. 2d at 192. Finally, in *Parlee*, "toxicology reports showed that lethal amounts of Oxymorphone were present in [the victim]'s blood and a physician opined that the cause of death was an acute Oxymorphone overdose." *Parlee*, 209 N.C. Ct. App. at 149.

Although the State is entitled to all reasonable inferences from the proof, the jury may not speculate an accused into the penitentiary. *See State v. Crawford*, 470 S.W.2d 610, 613 (Tenn. 1971), *overruled on other grounds by State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). To be sure, the series of events relayed by Mr. Wilson accompanied by the discovery of the victim's skeletal remains suggests that the defendant may have been involved in foul play. However, "a conviction for a criminal offense cannot be predicated solely upon conjecture, guess, speculation, or a mere possibility that [an accused] may be guilty," *State v. Transou*, 928 S.W.2d 949, 955 (Tenn. Crim. App. 1996) (citing *Rucker v. State*, 129 S.W.2d 208, 210 (Tenn. 1939); *State v. Cooper*, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987)), despite that inculpative evidence may be simply unavailable. We do not permit juries to speculate as to the cause of death in civil suits, when the burden of proof is lower, *see Kilpatrick*, 868 S.W.2d at 602 (observing that "proof of causation equating to a 'possibility,' a 'might have,' 'may have,' 'could have,' is not sufficient, as a matter of law, to establish the required nexus between the plaintiff's injury and the defendant's tortious conduct by a preponderance of the evidence in a medical malpractice case"), and we should not do so in criminal cases, when the State must prove its case beyond a reasonable doubt. In this case, the series of inferential leaps necessary to support the defendant's conviction crosses the line from reasonable to speculative, particularly in light of the fact that the State failed to prove any cause of death for the victim.

Accordingly, we hold that the evidence was insufficient to support the defendant's conviction of second degree murder. That conviction is reversed, and the charge is dismissed.

## II. Accomplice Testimony

In a related issue, the defendant asserts that the evidence was insufficient to support his conviction because Mr. Wilson was an accomplice, and the State failed to adduce sufficient evidence to corroborate his testimony. He also argues that the trial court erred by refusing to deem Mr. Wilson an accomplice as a matter of law. The State contends that the trial court did not err by refusing to declare Mr. Wilson an accomplice as a matter of law and that "there was sufficient corroborating evidence linking the defendant to the crime charged."

It is well settled "that a conviction may not be based solely upon the uncorroborated testimony of an accomplice to the offense." *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001) (citing *State v. Stout*, 33 S.W.3d 531 (Tenn. 2001); *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994); *Monts v. State*, 379 S.W.2d 34, 43 (Tenn. 1964)). By way of explanation, our supreme court has stated:

> There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence.

*Bane*, 57 S.W.3d at 419 (quoting *Bigbee*, 885 S.W.2d at 803); *see also State v. Fowler*, 373 S.W.2d 460, 463 (Tenn. 1963) (citations omitted).

An accomplice is an individual who knowingly, voluntarily and with common intent participates with the principal offender in the commission of an offense. *State v. Lawson*, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). "When the facts concerning a witness's participation are clear and undisputed, the trial court determines as a matter of law whether the witness is an accomplice." *State v. Robinson*, 146 S.W.3d 469, 489 (Tenn. 2004) (citing *Ripley v. State*, 227 S.W.2d 26, 29 (1950); *State v. Perkinson*, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992)). When "the facts are disputed or susceptible to different inferences," however, the determination of whether the witness is an accomplice is a question for the jury. *Robinson*, 146 S.W.3d at 489 (citing *Perkinson*, 867 S.W.2d at 7); *see also Conner v. State*,

531 S.W.2d 119, 123 (Tenn. Crim. App. 1975). "The test generally applied is whether the witness could be indicted for the same offense charged against the defendant." *Robinson*, 146 S.W.3d at 489 (citing *Monts v. State*, 379 S.W.2d 34, 43 (1964)).

Here, the trial court refused to instruct the jury that Mr. Wilson was an accomplice as a matter of law:

> Well, the accomplice instruction really has a great deal to do with credibility . . . can this person be believed and how involved were they. I think out of abundance of caution, it would be necessary that I give a charge of accomplice testimony and let the jury decide whether or not it's a question of fact that Mr. Wilson is an accomplice in this and then how they're going to take that. They may decide he's not. But, taking that from their consideration is . . . in my opinion dangerous, so I'm going to give the charge, and they will decide whether or not it's a question of fact Mr. Wilson was an accomplice, and they will go from there.

From this ruling, it is appears that the trial court did not believe Mr. Wilson to be an accomplice as a matter of law but perceived the facts to be such that the jury should be permitted to determine whether he was, in fact, an accomplice to the victim's death.

Under the circumstances of this case, the trial court did not err. Mr. Wilson testified that he traveled with the defendant, the victim, and the defendant's brother to Eagle Bluff rock to "get high" and that he handed the defendant water to prepare a syringe of methamphetamine for the victim. After the defendant and his brother returned to the truck without the victim, Mr. Wilson left with them. The jury could infer from this testimony that Mr. Wilson participated in the distribution of methamphetamine to the victim or that he was simply present during the offense. Because the proof was "susceptible to different inferences," the trial court did not err by submitting the issue of whether Mr. Wilson was an accomplice to the jury. *Robinson*, 146 S.W.3d at 489.

The jury could have concluded that Mr. Wilson was not an accomplice, rendering independent corroboration of his testimony unnecessary. If the jury concluded that Mr. Wilson was an accomplice, however, corroboration of his testimony was required. The State argues that Mr. Wilson's extrajudicial statements to the Mses. Mills and Mr. Thornsbury corroborate his testimony. Mr. Wilson's prior statements, however, cannot be deemed "entirely independent" of his testimony and cannot, therefore, corroborate his testimony. That being said, the presence of the victim's skeletal remains in the location

described by Mr. Wilson coupled by the defendant's statement to police that he had been at Eagle Bluff rock with Mr. Wilson and the victim "doing dope" corroborates Mr. Wilson's testimony. As discussed above, however, even Mr. Wilson's corroborated testimony was insufficient to support the defendant's conviction.

*III. Newly Discovered Evidence*

The defendant contends that newly discovered evidence in the form of the statement of Richard Morrison completely discredits Mr. Wilson's testimony implicating the defendant in the victim's murder and entitles him to a new trial. The State argues that the defendant is not entitled to a new trial because the evidence would not have changed the outcome of the trial.

At the hearing on the motion for new trial, the defendant presented an affidavit of Richard Morrison, which provided that Mr. Morrison was acquainted with the defendant, the victim, and Mr. Wilson. Mr. Morrison stated that Mr. Wilson had come to Mr. Morrison's residence "for the purpose of attempting to sell methamphetamine" and that during their negotiations, Mr. Morrison asked Mr. Wilson "what happened to Jayne Love, referring to her death." According to Mr. Morrison, Mr. Wilson said "that he and Robert ("Bobby") Evans cooked some methamphetamine that 'did not turn out right'" and that after cooking the "bad methamphetamine," Mr. Wilson and Mr. Evans "went up on the mountain with" the victim. Mr. Morrison said that Mr. Wilson told him that the victim "did a shot of the methamphetamine" and then "'just dropped,' and he assumed she had heart problems." Mr. Morrison claimed that his roommate "Joe Kotlowski was present throughout the course of the above-described conversation." The trial court deemed the affidavit "not sufficient as a basis" for the grant of a new trial but allowed the defendant an opportunity to subpoena Mr. Morrison to testify in court.

The defendant availed himself of the opportunity extended by the trial court, and Mr. Morrison testified that he executed the affidavit on May 16, 2011, and he adopted all its contents. During cross-examination, Mr. Morrison acknowledged that he was incarcerated in the Campbell County Jail from November 30, 2010, to January 10, 2011, and that during that time, he shared a cell with the defendant's brother "[f]or about three, maybe four days." Mr. Morrison said that he "never discussed anything with Russell Pack concerning his brother." Mr. Morrison testified that he had the relevant conversation with Mr. Wilson two months before executing the affidavit. Mr. Morrison said that he did nothing with the information "at first," but he later contacted the defendant's father and asked for contact information for the defendant's attorney. Mr. Morrison said that he had worked for the defendant's father "on and off for about six years." He testified that he knew Mr. Wilson because they "used to cook Meth together."

-16-

In its order denying the defendant's motion for new trial, the trial court, without analysis, ruled simply "that assertions made by defendant are not supported by credible evidence and therefore relief is denied."

Before a trial court may grant a new trial on the basis of newly discovered evidence, "it must find that the subsequently or newly discovered evidence 'may have resulted in a different judgment, had it been presented at the trial.' This rule presupposes that such evidence would be admissible." *Wilson v. State*, 367 S.W.3d 229, 235 (Tenn. 2012) (citations omitted). Moreover,

> [a]n accused seeking a new trial on the ground of newly discovered evidence must file an affidavit setting forth facts showing that he and his counsel exercised reasonable diligence and were not negligent in the search for evidence in preparation for the trial of the case, that he and his counsel had no pre-trial knowledge of the alleged newly discovered evidence, and it must be supported by the affidavit of the new witness showing the materiality of the testimony and that it had not been communicated to the accused prior to trial.

*Jones v. State*, 452 S.W.2d 365, 367 (Tenn. Crim. App. 1970). Our supreme court observed that "whether the testimony qualifies as impeachment evidence may be relevant in the determination but is not controlling," and concluded that because "[i]mpeachment evidence might be particularly compelling under the circumstances of a particular case," the "ultimate question" was not whether the purpose of the evidence was impeachment but rather the "effect of the newly discovered evidence on the outcome" of the trial. *State v. Vasques*, 221 S.W.3d 514, 528 (Tenn. 2007).

Here, the defendant established that he exercised due diligence and could not have discovered the evidence prior to trial. Mr. Morrison testified that he did not learn the information until 2011, well after the conclusion of the defendant's March 2010 trial. The trial court determined, however, that the defendant had failed to present credible evidence, implicitly concluding that Mr. Morrison's affidavit and testimony lacked credibility. Because the trial court was not "'reasonably well satisfied'" with the veracity of the evidence, it did not err by denying the defendant's motion for new trial. *See Vasques*, 221 S.W.3d at 527. The defendant is not entitled to relief on this issue.

*IV. Evidentiary Issues*

The defendant next asserts that the trial court erred by denying his motion in limine to exclude "all evidence of sexual contact between [the defendant] and the victim" and by denying his motion to suppress "all evidence discovered" by Mr. Gaylor. He argues that the evidence "was irrelevant, inflammatory, and highly prejudicial" and that the evidence should have been excluded pursuant to Tennessee Rule of Evidence 403. The State contends that the trial court did not abuse its discretion by admitting the evidence.

Questions concerning evidentiary relevance rest within the sound discretion of the trial court, and this court will not interfere with the exercise of this discretion in the absence of a clear abuse appearing on the face of the record. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)); *see also State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999).

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "Evidence which is not relevant is not admissible," Tenn. R. Evid. 402, and even if evidence is deemed relevant, it may be still be excluded "if the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

The challenged evidence consisted of the Crown Royal bag that contained the victim's driver's license, sundry personal items, and the sealed plastic bag, which itself contained a pair of women's underwear stained with the DNA of the victim and the defendant. The State argues that the evidence was relevant to establish that the defendant was in the same area where the victim died. We are not convinced, however, that this evidence actually establishes the defendant's presence at the scene. First, the State failed to present any proof that the location of the skeletal remains was, in fact, where the victim died. Second, the items in question were discovered "a little less than a mile" from the remains more than six months after the remains themselves were discovered. Finally, the underwear containing the defendant's DNA was inside a sealed plastic bag, and neither the plastic bag nor the other items discovered inside the Crown Royal bag bore the defendant's DNA. The clothing recovered from the victim's body did not contain any forensic evidence linking it

to the defendant.

That being said, any error in the admission of this evidence can be classified as harmless. The defendant did not deny that he had been in a romantic relationship with the victim, and, at least in one of the statements provided to police, acknowledged that he had been in the Eagle Bluff rock area with the victim before her death.

*V. Closing Argument*

The defendant argues that the trial court erred by permitting the State to comment on the defendant's failure to testify during closing argument and that the prosecutor engaged in prosecutorial misconduct by arguing facts not in evidence, intentionally misleading the jury, and employing argument designed to "inflame the passions or prejudices of the jury." The State argues that the argument was not improper and, in the alternative, that even if the argument was improper, it can be deemed harmless error.

Despite the discretion afforded trial courts in determining the propriety of closing argument, judges must nevertheless take care to restrict improper argument. *State v. Hill*, 333 S.W.3d 106, 130 (Tenn. Crim. App. 2010) (citing *Sparks v. State*, 563 S.W.2d 564, 569-70 (Tenn. Crim. App. 1978)). Because of the State's unique role in a criminal case, the State, in particular, "must refrain from argument designed to inflame the jury and should restrict its commentary to matters in evidence or issues at trial." *Hill*, 333 S.W.3d at 130. This rule is based in great measure upon the role of the prosecutor in the criminal justice system:

> [The prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor – indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

> It is fair to say that the average jury, in a greater or less

degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none. . . .

*Berger v. United States*, 295 U.S. 78, 88 (1935). We have consistently held that closing argument for both parties "'must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried.'" *Hill*, 333 S.W.3d at 130 (quoting *State v. Sutton*, 562 S.W.2d 820, 823 (Tenn. 1978)). Even inappropriate closing argument will not warrant a new trial unless it was so inflammatory or improper as to affect the verdict. *Id.* (quoting *Harrington v. State*, 385 S.W.2d 758, 759 (1965)). When determining the propriety of closing argument, this court considers the following factors:

> (1) The conduct complained of viewed in the context and in light of the facts and circumstances of the case[;]
> (2) [t]he curative measures undertaken by the court and the prosecution[;]
> (3) [t]he intent of the prosecutor in making the improper statements[;]
> (4) [t]he cumulative effect of the improper conduct and any other errors in the record [; and]
> (5) [t]he relative strength or weakness of the case.

*Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

During closing argument, the prosecutor made the following challenged remarks:

> You heard testimony from Mrs. Herman, her probation officer. . . . Mrs. Herman testified that [the victim] had never tested positive for Meth . . . and she supervised her for two years.
>
> . . . .
>
> One of the Judge's instructions is that you can look at the demeanor of witnesses. You can look at how people act when

-20-

you see them. . . . [Y]ou're not asked to just put aside all your personal knowledge and prior experience and everything when you come in the Courtroom. And I want to remind you about how Mr. Pack has conducted himself in this Courtroom. Y'all have observed him, you've seen him, I don't have to go into a lot of detail. Most of y'all were here probably 45 minutes or an hour before Court started yesterday. Do you remember when he showed up? He don't care. We're hoping that you all care, because that's . . . what this case is about. Mr. Pack is sitting over here thinking he can just walk away just like he did that night back in May, leave the trash laying out on the mountain, go to the house, lie when you need to lie, say whatever you need to say, it'll go away. Well it ain't gonna go away. The proof is there, you've heard the proof. You know what happened in this case. This man is guilty. He's responsible for killing this girl. He needs to be convicted of it.

. . . .

The evidence before you: They went up to the mountain, [the defendant] prepared the concoction of Methamphetamine – the large amount of Methamphetamine, injected it into her. There's testimony that he, in fact, injected it into her.

Initially, we note that the defendant did not lodge a contemporaneous objection to any of the remarks he now challenges on appeal. Thus, to be entitled to relief, he must establish not only that the remarks were improper but also that they rose to the level of plain error. *State v. Gann*, 251 S.W.3d 446, 458 (Tenn. Crim. App. 2007) (holding that defendant's failure to lodge a contemporaneous objection during challenged closing argument waived plenary review of the issue and left only plain error review).

Before an error may be recognized as plain, it "must be 'plain' and it must affect a 'substantial right' of the accused." *State v. Adkisson*, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006).

In *State v. Smith*, our supreme court adopted *Adkisson*'s five-factor test for determining whether an error should be recognized as plain:

-21-

(a) the record must clearly establish what occurred in the trial court;

(b) a clear and unequivocal rule of law must have been breached;

(c) a substantial right of the accused must have been adversely affected;

(d) the accused did not waive the issue for tactical reasons; and

(e) consideration of the error is "necessary to do substantial justice."

*Smith*, 24 S.W.3d 274, 282-83 (Tenn. 2000) (quoting *Adkisson*, 899 S.W.2d at 641-42). "[A]ll five factors must be established by the record before this court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* at 283.

In our view, the challenged comments were improper. The prosecutor's statement that "Mrs. Herman testified that [the victim] had never tested positive for Meth" was inaccurate and argued facts not in evidence. *Judge*, 539 S.W.2d at 345 (ruling that prosecutor should not argue facts outside the record). Ms. Herman did not testify that the victim had submitted to drug testing, much less that she had never tested positive for the use of methamphetamine. Ms. Herman's testimony regarding the victim's fulfillment of the conditions of her probation was, at best, vague. Ms. Herman testified that the victim reported as scheduled and "was compliant" with the terms of her probation. Without information that the terms of her probation required drug testing, the prosecutor could not have inferred from Ms. Herman's testimony that the victim had submitted to and passed even a single drug screen. Similarly, the prosecutor's statement, "There's testimony that he, in fact, injected it into her," was an inaccurate recitation of the proof at trial. Although Mr. Wilson testified that he observed the defendant prepare a syringe with methamphetamine and that the victim "done it," he maintained that he did not actually see the victim inject the methamphetamine and did not see the defendant inject the methamphetamine into the victim.

The prosecutor should not have urged the jury to consider the defendant's demeanor during trial given the defendant's decision not to testify at trial. *Compare United States v. Schuler*, 813 F.2d 978, 981 (9th Cir. 1987) (observing that "prosecutorial comment on a defendant's non-testimonial behavior may impinge on that defendant's fifth amendment right not to testify") *with State v. Fredrick Sledge*, No. 02C01-9405-CR-00089, slip op. at

48 (Tenn. Crim. App., Jackson, Nov. 24, 1997) (observing that "[d]emeanor is a relevant consideration in the context of the defendant's claim of remorse" during his trial testimony).

Although not raised by the defendant, we observe that the prosecutor should not have told jurors that any reservations or doubts they might have regarding the victim's cause of death were "speculation, you can't do that."

Examining these comments in the context of the *Judge* factors, no curative measures were undertaken, and the State's case against the defendant was extraordinarily weak. That being said, we cannot assign a nefarious motive to the prosecutor's making the comments, and the improper comments were not terribly egregious when considered "in light of the facts and circumstances of the case" and did not lend a cumulative effect to other trial errors. Moreover, at the hearing on the motion for new trial, trial counsel intimated that his failure to object was a strategic choice "not . . . to call attention to the issue." Under these circumstances, the error occasioned by the improper remarks does not rise to the level of plain error.

*VI. Conclusion*

The trial court did not err by refusing to declare Mr. Wilson an accomplice as a matter of law or by concluding that newly discovered evidence did not entitle the defendant to a new trial. Any error occasioned by the trial court's admission of evidence discovered by Mr. Gaylor was harmless. Although the prosecutor made improper remarks during his closing argument, the error did not rise to the level of plain error. The defendant established that trial counsel may have performed deficiently but failed to establish that he was prejudiced by counsel's deficient performance. Finally, because the State failed to establish the cause in fact of the victim's death, it failed to establish that the proximate cause of the victim's death was the defendant's provision to her of methamphetamine, and, in consequence, the evidence was insufficient to support the defendant's conviction of second degree murder as charged in this case.

Accordingly, the defendant's conviction is reversed, and the charge is dismissed.

_____
JAMES CURWOOD WITT, JR., JUDGE

-23-