IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
December 15, 2020 Session

## STATE OF TENNESSEE v. QUANTAVIOUS WILLIAMS

**Appeal from the Criminal Court for Knox County**
**No. 104542C     Bob McGee, Judge**

### No. E2019-02266-CCA-R3-CD

A Knox County Criminal Court jury convicted the defendant, Quantavious Williams, of first degree murder, attempted especially aggravated robbery, carjacking, employing a firearm during the commission of a dangerous felony, aggravated robbery, and aggravated kidnapping.  In this appeal, the defendant challenges those convictions on grounds that the trial court erred by excluding expert testimony regarding the defendant's mental state at the time of the alleged offenses and that the evidence was insufficient to establish his guilt. Discerning no error, we affirm.

**Tenn. R. App. P. 3; Judgments of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Gerald L. Gulley (on appeal) and Kevin Angel (at trial), Knoxville, Tennessee, for the appellant, Quantavious Williams.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Charme P. Allen, District Attorney General; and TaKisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Knox County Grand Jury charged the defendant, whose street name was "Lil Rich Rollin'," and co-defendants Nolandus "Lil 20 C" Sims, Andre "Evil D" Terry, and Antonio "Yellowboy" Marlin[1] via presentment with alternative counts of the felony murder of Jack Hutchins, one count of the first degree premeditated murder of Mr.

---

[1]     Mr. Marlin was also known as "C Rider."

Hutchins, alternative counts of the attempted especially aggravated robbery of Mr. Hutchins, alternative counts of the carjacking of Larry Mathis, one count of employing a firearm during the commission of the dangerous felony of carjacking, alternative counts of the aggravated robbery of Mr. Mathis, and alternative counts of the especially aggravated kidnapping of Mr. Mathis.

The evidence adduced at the defendant's trial[2] established that in November 2013, Mr. Sims, Mr. Terry, and Mr. Marlin traveled to Knoxville from Chattanooga in a stolen car to visit the defendant. The defendant, Mr. Sims, and Mr. Terry were all members of the Rollin' 20s Crips street gang, and Mr. Marlin was a member of the Rollin' 40s Crips street gang. Mr. Marlin stated that, because he was a member of the Rollin' 40s Crips, he had to obtain permission to travel to Knoxville with Rollin' 20s Crips members and that Mr. Sims obtained that permission while on a telephone call with a person that Mr. Marlin believed to be the defendant. Mr. Marlin recalled that after he and the others had been in Knoxville for a couple of days, the defendant mentioned that he "needed money for his hood," which Mr. Marlin understood to mean "[h]is 20s Crips." The defendant and other members of the Rollin' 20s Crips went "in a room [to] discuss some things" out of the presence of Mr. Marlin, who, because of his membership in the Rollin' 40s Crips, was not privy to Rollin' 20s Crips business. Shortly thereafter, the young men left the defendant's apartment with a plan to commit a home invasion robbery at the Townview Terrace apartment complex.[3] Mr. Sims and Mr. Terry were armed with handguns. When the Townview Terrace endeavor proved unsuccessful, the group decided to drive around looking for "randoms," described by Mr. Marlin as "just random acts of crime, just burglaries, robberies, murders." Eventually, they encountered Mr. Mathis sitting in the parking lot of the church where he was a pastor.

Mr. Mathis testified that as he sat in his 2005 Cadillac Escalade, "two gentlemen," whom Mr. Mathis later identified as Mr. Sims and Mr. Terry, "came from the right side and . . . tapped on the window." Mr. Mathis lowered the window, and Mr. Terry told him "to get out of the car" and to "get down on the ground." Mr. Mathis complied, and the men took his cellular telephone and wallet. The men then got into Mr. Mathis's vehicle "and tried to start it, and they couldn't because of the kink of the bow in the gear shift, and told me to get up and start it and don't . . . drive off or whatever." Mr. Mathis started the vehicle and then got back onto the ground. Mr. Terry got into the driver's seat, and the two men drove "up North Kyle." Mr. Mathis remained on the ground until the car

---

[2]    The defendant's first trial ended in a mistrial after the jury was unable to reach a verdict. This is an appeal of the second trial in this case conducted between October 30 and November 3, 2017.

[3]    At the time of the offenses, Mr. Sims was 19 years old, the defendant and Mr. Marlin were 17 years old, and Mr. Terry was 15 years old. Mr. Marlin indicated that Ralph "Too Evil" Bell and Khyree "Gold Flag" Thompson, who were also members of the Rollin' 20s Crips but were not charged in this case, participated in the discussion and were in the car at the time of both offenses.

was out of sight because he "was pretty scared, to be honest." Mr. Marlin confirmed that Mr. Terry and Mr. Sims "[a]pproach[ed] the preacher and robbed him at gunpoint and put him on the ground and took his vehicle."

The rest of the group followed Mr. Terry and Mr. Sims until they abandoned Mr. Mathis's vehicle a short distance away. Mr. Terry and Mr. Sims then got back into the car, and the group drove onto Woodbine and saw Mr. Hutchins "with some bags in his hand at his car." Mr. Sims and Mr. Terry got out of the car. Mr. Marlin said, "When they got out of the vehicle, we drove away. So I don't know exactly what they did as soon as they got out the vehicle, but I know we drove away." Mr. Bell stopped the car a short distance away, around a corner. Beth Dompier, Mr. Hutchins' fiancée, testified that Mr. Hutchins had gone to pick up food for the family and that she had heard him return and open the door of his truck. She then heard gunfire, and, after she did not hear the sound of Mr. Hutchins closing his truck door, she went outside to investigate. She found Mr. Hutchins lying on the ground "bleeding out of his mouth" and unable to breathe. Medical evidence established that Mr. Hutchins suffered at least four gunshot wounds, two of which entered his back and traveled through his right lung. He died as a result of the injuries.

Mr. Hutchins' neighbor, Christopher Estes, heard the gunshots and looked out his window to see "two dark figures" jogging away from the area of Mr. Hutchins' house. Another neighbor, Jerome Diaz, also heard the gunshots and looked outside to investigate. He saw "two young guys," one of whom Mr. Diaz identified as Mr. Terry, "running past my house." Mr. Diaz heard a scream and ran down to the corner, where he saw Ms. Dompier holding Mr. Hutchins.

Mr. Marlin recalled that after he and the other men in the car heard "multiple gunshots," they drove back onto Woodbine and saw Mr. Hutchins "on the ground with blood and we picked [Mr.] Sims and [Mr.] Terry back up." Mr. Terry and Mr. Sims were "kind of freaking out, not as -- freaking out as scared, but saying that he was reaching for something." The group then returned to the defendant's house, and Mr. Marlin returned to Chattanooga that same night with Mr. Terry, Mr. Sims, and Mr. Thompson.

On December 30, 2013, acting on information gleaned during the investigation, former Knoxville Police Department ("KPD") Investigator Brian Moran went to Mountain View Correctional Facility in Dandridge to interview an inmate who claimed to have information about the death of Mr. Hutchins. Based upon the information he received during that interview, Investigator Moran identified two juveniles known as Evil D and Lil Rich Rollin' as suspects in the offenses committed against Mr. Hutchins and Mr. Mathis. Investigator Moran interviewed the defendant in March 2014. A video recording of Investigator Moran's interview with the defendant was exhibited to Mr. Moran's testimony and played for the jury.

-3-

In the interview, the defendant initially denied any knowledge of the offenses and specifically denied knowing Mr. Terry. He claimed that he had been in New Mexico for nearly four years with his girlfriend. The defendant denied being a member of the Rollin' 20s Crips and insisted that his street name was Lil Rich and not Lil Rich Rollin' even though Lil Rich Rollin' was the name on his Facebook page. Later, the defendant acknowledged that he knew Mr. Terry as Evil D and that Mr. Terry had murdered Mr. Hutchins. The defendant told Investigator Moran that he "was told" that Evil D and Lil 20 C "both had .380s" and that they were "ridin' in some Nissan . . . robbin' people." He maintained that he was not present during the offense but had learned about it during a telephone conversation with "Weinie Man," the "general" of the Rollin' 20s Crips.

The defendant told Investigator Moran that Weinie Man told him that Evil D and Lil 20 C "got some stars," meaning that they "hit some people," when they drove a stolen car from Chattanooga to Knoxville with "seven homies," including men the defendant knew as Gold Flag and C Rider, to "rob somebody in Townview Towers." The defendant said that the men met up with "some 20s from Ohio," who provided them with guns and "put 'em on a lick." The Chattanooga group then "rode through the projects and gun pointed a preacher," "robbed him and dropped it off in the park." The defendant said that Weinie Man told him that Mr. Terry shot Mr. Hutchins twice in the face and that Mr. Sims shot twice before they ran away. According to the defendant, Weinie Man wanted the defendant to help Mr. Sims and Mr. Terry get out of Knoxville.

Upon further questioning, the defendant admitted that he had been in Knoxville at the time of the offenses and that the co-defendants "came through" to see him before the shooting. He nevertheless insisted that he did not participate in the offenses and that the co-defendants "didn't pick me up until after this s*** happened." The defendant said that the men told him that they "jacked a preacher" and "knocked somebody off and somethin'." They told the defendant that they had attempted a home invasion at Townview Terrace and then carjacked "the preacher" but ditched his car when it ran out of gas. They then drove over to Woodbine, "hit the block, seen him, then they parked" and shot Mr. Hutchins in the face. According to the defendant, Mr. Terry bragged that he shot Mr. Hutchins in the face, and Mr. Sims bragged that he shot Mr. Hutchins twice. The defendant told Investigator Moran that the other men wanted him "to get down," meaning join their gang, so they took him "over to Christenberry" to get "smashed in." The defendant said that he "was supposed to got put down," but it did not go off as planned, so he called his brother Elvin, who was also known as "Big Rich Rollin'," to give him a ride home.

Eventually, the defendant admitted to Investigator Moran that he had been present during the offenses, saying, "Alright I was there, but they said if I say anything they was gonna kill me. They was gonna kill my son and my baby mama." He insisted

that he "didn't get out the car none of the times. . . . We went to Townview first." The defendant said that he "was supposed to be proving myself" but that "obviously I didn't prove myself which is why I didn't get put down." He recalled that the other men decided to "do randoms" when "Townview was a dry run." They drove thru Walter P. Taylor Homes, where the carjacking occurred. He said that Mr. Sims and Mr. Terry "dumped" Mr. Mathis's vehicle "by the old folks home off MLK" when it ran out of gas. "Everybody hopped in the car," and the group drove down Woodbine, where they let Mr. Sims and Mr. Terry out of the car and drove off. They came "back around" and saw a man bleeding in the street. The defendant maintained that he did not know that Mr. Sims and Mr. Terry planned to kill anyone. He also claimed that he did not find out that Mr. Hutchins was the victim until someone called the defendant's girlfriend, Deshawnte "Tay-Tay" Dompier, who was Ms. Dompier's stepdaughter. He said that he was shocked and that "Tay-Tay was pissed about it."

The defendant told Investigator Moran that after the shooting of Mr. Hutchins, the group drove to Christenberry, where the others told "the Ohio men" that the defendant was "a b****" and "a ho" because he "froze up" at Townview Terrace and then refused to participate in the later offenses.

Detective Thomas Walker, the head of the KPD Gang Intelligence Unit, testified as an expert in gang investigation that most street gangs "fall under one of two Nations, either People Nation or Folk Nation." "People Nation gangs will be your Blood sets, Pirus, Latin Kings and Vice Lords, where Folk Nation gangs will be your Crips sets, your Gangster Disciples and your Insane Gangster Disciples, and then the subgroups that fall underneath them." The various Crip sets active in the Knoxville area included the "Rollin' 20s Crips, Rollin' 60s Crips, 52 Hoover Crips, Kitchen Crips, [and] North Side Crips." Detective Walker explained that gang members "sell drugs, rob, steal, get guns, you know, to promote their own gang" and to bring money into the organization. Detective Walker confirmed that, even though they both belonged to Crip sets, members of the Rollin' 20s Crips would not discuss gang business in the presence of a member of the Rollin' 40s Crips "for security reasons" and because "they might be afraid he might testify against them, like what happened here today."

Detective Walker explained that the KPD and other law enforcement agencies utilized a point system to determine gang affiliation but cautioned that points alone were insufficient to actually certify someone as a gang member until that person "commits a criminal act that meets the gang definition." Nineteen confirmed members of the Rollin' 20s Crips and 40 to 50 confirmed members of the Rollin' 40s Crips had passed through the Knox County Jail. Detective Walker testified that the defendant was confirmed as a member of the Rollin' 20s Crips as a juvenile in March of 2012. Information gleaned from the defendant's Facebook page and the presence of numerous gang-affiliated tattoos

on his body at the time of his arrest supported this conclusion.  He confirmed that Messrs. Sims and Terry were members of the Rollin' 20s Crips and that Mr. Marlin was a member of the Rollin' 40s Crips.  Detective Walker added that, while the defendant was incarcerated in the Knox County Jail, officers confiscated multiple letters wherein the defendant attempted to recruit other inmates to join the Rollin' 20s Crips.  One such letter described in detail "the history of the gang, who's in the gang, who the rivals are, who their allies are, ranks. . . . what their street names are."  The letter also contained information about the defendant's own rank within the gang.

"The Rollin' 20s Crips have a ranking system" that is based upon the number of "stars," or points, an individual has earned by engaging in various criminal activities, known as hitting "a lick," or other forms of gang promotion.  Detective Walker said that "a little lick" would refer to a petty crime while "a big lick" would refer to a more serious crime or a greater monetary take.  "Randoms" referred to "random crimes.  They're going out, they don't have a . . . solid plan on what they want to do.  They're just looking for victims that they think might have money."  Gang members often went out in groups to commit crimes because "that's a lot more intimidating."  It was Detective Walker's understanding, based upon interviews he had conducted with other gang members, that "if you're there, you get stars.  The guys that actually hold the guns get more stars than the guys that are just the driver or sit in the car."  In May 2014, the defendant mentioned during a recorded telephone conversation that "he earned his G status," meaning that he "was promoted to OG, Original Gangster," which indicated that the defendant had "moved up about three ranks" from the rank of "Original Baby Gangster," which was the rank he indicated in "a letter he wrote to recruit another inmate."  Officer Walker described the defendant's rank of OG as being "at the lower end of the supervisory level."  Detective Walker said that although it was unclear whether, at the time of the offenses, the defendant outranked Messrs. Sims and Terry, it was clear that he had no supervisory authority over them.  At the time of the offenses, the defendant had 12 points in his gang file while Mr. Terry had 46 and Mr. Sims had 34.  Mr. Walker acknowledged that, had the defendant demanded to be let out of the car, "[t]hey probably would have lost a lot of respect for him in the gang" and might have reacted violently.

Based upon the evidence presented at trial, the jury convicted the defendant as charged.  Following a sentencing hearing, the trial court merged the alternative counts and imposed a total effective sentence of life imprisonment.  In this timely appeal, the defendant asserts that the trial court erred by excluding evidence of his mental state at the time of the offenses and that the evidence was insufficient to support his convictions.

*I. Expert Testimony*

The defendant asserts that the trial court erred by prohibiting testimony from

Doctor Eric Engum regarding the defendant's mental state at the time of the offenses. The State contends that the trial court did not err.

The record indicates that the trial court held a hearing on the admissibility of Doctor Engum's testimony prior to the defendant's first trial and that the court concluded, following that hearing, that Doctor Engum's testimony was inadmissible. The defendant's first trial ended in a mistrial, and prior to the defendant's second trial, he asked the trial court to reconsider its decision to exclude Doctor Engum's testimony. The trial court, referencing the earlier hearing, noted that there had been no change in either the law or the contents of Doctor Engum's report since the court made its earlier determination and denied the defendant's request. The transcript of the original hearing on the admissibility of Doctor Engum's testimony does not appear in the record in this appeal. Thus, we review the issue using only Doctor Engum's report, which was appended to the defendant's notice of his intent to use Doctor Engum's testimony at trial and included in the record of this appeal.

From the outset, Doctor Engum stated unequivocally that, because he had not been asked to either evaluate the defendant's "state of mind at the time of the charged offenses under either the cognitive or the volitional prong of the insanity defense" or to determine "whether [the defendant] was incapable of forming the specific intent to commit the charged offenses," he would express no opinion on either issue. "Instead," Doctor Engum stated, he was asked to determine "whether there were neuropsychological test findings which might support the assertion that [the defendant] was unaware of and oblivious to the planning and execution of the actions which supplemented, advanced, aided, or culminated in the criminal actions of the named co-defendants." Doctor Engum ultimately concluded that

> [w]hile certainly the ultimate determination of whether [the defendant] was aware of and/or possessed knowledge of the plans, intentions, and preparatory actions of his co-defendants is a fact specific inquiry, the results of the present neuropsychological evaluation may be utilized to support the assertion that due to his myriad cognitive impairments that he was[] unaware of and oblivious to those plans, intentions and preparatory actions.

Doctor Engum cautioned, however, that "it would be improper, based upon the results of the present neuropsychological assessment, to conclude that [the defendant] was incapable of forming the specific intent to engage in certain actions or pursue certain goals or objectives."

In *State v. Hall*, our supreme court held that, because "the general criminal law requires that mental state be proven by the State beyond a reasonable doubt," "evidence which tends to prove or disprove the required mental state is relevant and generally admissible under Tennessee law." *State v. Hall*, 958 S.W.2d 679, 689 (Tenn. 1997). That being said, "expert testimony regarding a defendant's incapacity to form the required mental state must satisfy the general relevancy standards as well as the evidentiary rules which specifically govern expert testimony." *Id.* "Assuming that those standards are satisfied, psychiatric evidence that the defendant lacks the capacity, because of mental disease or defect, to form the requisite culpable mental state to commit the offense charged is admissible under Tennessee law." *Id.* The supreme court "emphasize[d] that the psychiatric testimony must demonstrate that the defendant's inability to form the requisite culpable mental state was the product of a mental disease or defect, not just a particular emotional state or mental condition," stating, "It is the showing of a lack of capacity to form the requisite culpable mental intent that is central to evaluating the admissibility of expert psychiatric testimony on the issue." *Id.* at 690 (citing *State v. Shelton*, 854 S.W.2d 116, 122 (Tenn. Crim. App. 1992)). Although the court expanded the holding in *Hall* to encompass testimony from experts other than psychiatrists, the court has consistently held "that '[e]vidence that the defendant suffered from a mental disease or defect'" is only "admissible whenever it is relevant to prove that the defendant did or did not have the state of mind which is an element of the offense." *State v. Ferrell*, 277 S.W.3d 372, 379 (Tenn. 2009) (quoting *Hall*, 958 S.W.2d at 690 n.9); *see also Nesbit v. State*, 452 S.W.3d 779, 798 (Tenn. 2014); *State v. Adams*, 405 S.W.3d 641, 661 (Tenn. 2013); *State v. Hatcher*, 310 S.W.3d 788, 806 (Tenn. 2010). These cases, as well as the myriad cases of the same ilk decided by this court, clearly establish that expert testimony on the issue of diminished capacity is admissible only when it demonstrates that the defendant "lacked the capacity" as a product of mental disease or defect to form the requisite mens rea for the charged offense.

As indicated, Doctor Engum did not conclude that the defendant lacked the capacity to form the requisite mens rea for any of the charged offenses. Indeed, the defendant does not argue as much. Instead, he asserts that his various mental health and cognitive issues prevented him from fully appreciating the actions of his co-defendants. This testimony is more akin to testimony about "'a particular emotional state or mental condition' rather than on [d]efendant's 'lack of capacity to form the requisite culpable mental intent.'" *Hatcher*, 310 S.W.3d at 807 (quoting *Hall*, 958 S.W.2d at 690). This caliber of testimony does not satisfy the requirements for admissibility under the *Hall* standard. The fact that one person, even by virtue of certain impairments, might react differently to a particular stimulus or circumstance "does not provide a means for that person to be absolved from the same responsibility to which the law holds another who might be" disposed to respond differently "to the same stimulus. If it did, then each person would be the law unto him or herself based solely upon his or her particular personality

makeup." *Hall*, 958 S.W.2d at 692. "It is well established that a mental disease or defect that impairs or reduces a defendant's capacity to form the requisite culpable mental state for the offense" but does not negate it altogether "does not satisfy the two-prong test under *Hall*." *State v. Lesergio Duran Wilson*, No. M2014-01487-CCA-R9-CD, 2015 WL 5170970, at \*12 (Tenn. Crim. App., Jackson, Sept. 2, 2015) (citing *State v. Tray Dontacc Chaney*, No. W2013-00914-CCA-R9-CD, 2014 WL 2016655, at \*9 (Tenn. Crim. App, Jackson, May 14, 2014); *State v. Herbert Michael Merritt*, No. E2011-01348-CCA-R3-CD, 2013 WL 1189092, at \*27 (Tenn. Crim. App., Knoxville, Mar. 22, 2013); *State v. Anthony Poole*, No. W2007-00447-CCA-R3-CD, 2009 WL 1025868, at \*11 (Tenn. Crim. App., Jackson, Apr. 14, 2009); *State v. Antonio D. Idellfonso-Diaz*, No. M2006-00203-CCA-R9-CD, 2006 WL 3093207, at \*4 (Tenn. Crim. App., Nashville, Nov. 1, 2006)). Because Doctor Engum's testimony did not satisfy the requirements in *Hall*, the trial court properly excluded the testimony.

## II. Sufficiency

The defendant was convicted of the first degree murder and attempted especially aggravated robbery of Mr. Hutchins and the carjacking, especially aggravated kidnapping, and aggravated robbery of Mr. Mathis as well as employing a firearm during the commission of a dangerous felony. His culpability was based upon a theory of criminal responsibility for the actions of his co-defendants. In his challenge to the sufficiency of the evidence, the defendant does not challenge the elements of any of the conviction offenses but argues that the State failed to establish that he was criminally responsible for the acts committed by his co-defendants because the evidence of his culpability consisted entirely of Mr. Marlin's uncorroborated testimony. The State asserts that Mr. Marlin's testimony was corroborated by the defendant's own statement and that, as a result, the evidence was sufficient to support his convictions.

Sufficient evidence exists to support a conviction if, after considering the evidence—both direct and circumstantial—in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). This court will neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at 379. The verdict of the jury resolves any questions concerning the credibility of the witnesses, the weight and value of the evidence, and the factual issues raised by the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

"A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-12-401. "[C]riminal responsibility is not a separate, distinct crime" but is instead "a theory by which the State may prove the defendant's guilt of the alleged offense . . . based upon the conduct of another person." *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999). Criminal responsibility "is a codification of the common-law theories of aiding and abetting and accessories before the fact." *Id.* at 171 (citing *State v. Carson*, 950 S.W.2d 951, 955 (Tenn. 1997)). "No particular act need be shown, and the defendant need not have taken a physical part in the crime in order to be held criminally responsible." *State v. Caldwell*, 80 S.W.3d 31, 38 (Tenn. Crim. App. 2002). Criminal responsibility "requires that a defendant act with a culpable mental state, [i.e.], the 'intent to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense.'" *Carson*, 950 S.W.2d at 954 (quoting T.C.A. § 39-11-402(2) (1991)). The "natural and probable consequences rule," which "survived the codification of the common law into the criminal responsibility statutes," "extends the scope of criminal liability to the target crime intended by a defendant as well as to other crimes committed by a confederate that were the natural and probable consequences of the commission of the original crime." *State v. Howard*, 30 S.W.3d 271, 276 (Tenn. 2000) (citing *Carson*, 950 S.W.2d at 954-55 (Tenn. 1997)).

It is well settled "that a conviction may not be based solely upon the uncorroborated testimony of an accomplice to the offense." *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001) (citing *State v. Stout*, 46 S.W.3d 689, 696-97 (Tenn. 2001); *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994); *Monts v. State*, 379 S.W.2d 34, 43 (Tenn. 1964)). Indeed, "[w]hen the only proof of a crime is the uncorroborated testimony of one or more accomplices, the evidence is insufficient to sustain a conviction as a matter of law." *State v. Jones*, 450 S.W.3d 866, 888 (Tenn. 2014) (citing *State v. Collier*, 411 S.W.3d 886, 894 (Tenn. 2013)). By way of explanation, our supreme court has stated:

> There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's

evidence.

*Bane*, 57 S.W.3d at 419 (quoting *Bigbee*, 885 S.W.2d at 803); *see also State v. Fowler*, 373 S.W.2d 460, 463 (Tenn. 1963).

An accomplice is an individual who knowingly, voluntarily, and with common intent participates with the principal offender in the commission of an offense. *State v. Lawson*, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990). "When the facts concerning a witness's participation are clear and undisputed, the trial court determines as a matter of law whether the witness is an accomplice." *State v. Robinson*, 146 S.W.3d 469, 489 (Tenn. 2004) (citing *Ripley v. State*, 227 S.W.2d 26, 29 (1950); *State v. Perkinson*, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992)). When "the facts are disputed or susceptible to different inferences," however, the determination of whether the witness is an accomplice is a question for the trier of fact. *Robinson*, 146 S.W.3d at 489 (citing *Perkinson*, 867 S.W.2d at 7); *see also Conner v. State*, 531 S.W.2d 119, 123 (Tenn. Crim. App. 1975). "The test generally applied is whether the witness could be indicted for the same offense charged against the defendant." *Robinson*, 146 S.W.3d at 489 (citing *Monts*, 379 S.W.2d at 43).

To be sure, Mr. Marlin was an accomplice to the charged offenses. That being said, his testimony was sufficiently corroborated by other evidence in the record, including the defendant's own statement. *See, e.g.*, *State v. Pack*, 421 S.W.3d 629, 645 (Tenn. Crim. App. 2013) (stating that physical evidence "coupled by the defendant's statement to police" corroborated accomplice's testimony).

Mr. Marlin testified that, while he and the other co-defendants, who were all from Chattanooga, were visiting with the defendant, the defendant remarked that he needed money "for his hood," a reference to his gang. The defendant told Investigator Moran that he "was supposed to be proving myself" to the other gang members on that evening. Mr. Marlin said that after the defendant said that he needed money, he and the other Rollin' 20s Crips went into another room and had a discussion to which Mr. Marlin was not privy. Detective Walker testified that because Mr. Marlin was a member of the Rollin' 40s Crips, he would not have been included in a discussion of Rollin' 20s Crips business. Just after that discussion, the defendant and the co-defendants left the defendant's residence with the intent to commit a home invasion at Townview Terrace. Both the defendant and Mr. Marlin said that after the Townview Terrace plan was unsuccessful, the group settled on committing "randoms." Mr. Marlin, the defendant, and Detective Walker all indicated that "randoms" referred to random crimes. The defendant knew that Mr. Sims and Mr. Terry were armed. Mr. Marlin testified that Messrs. Sims and Terry carjacked Mr. Mathis, and that testimony was corroborated by Mr. Mathis, who identified Messrs. Sims and Terry as the men who confronted him at gunpoint, forced him to the ground, and stole his car, wallet,

and cellular telephone. Mr. Marlin's testimony that Messrs. Sims and Terry also shot Mr. Hutchins was corroborated by Mr. Diaz's identification of Mr. Terry as one of the two men he saw running from the scene just after the shooting. The defendant never indicated to Investigator Moran that he did not share a common purpose with the co-defendants that evening, only that he did not know that they intended to kill Mr. Hutchins and that he "froze" when called upon to take a more active role. Despite that the defendant did not play a physical role in the actual crimes, the evidence was sufficient to establish that he acted with "the 'intent to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense.'" *Carson*, 950 S.W.2d at 954 (quoting T.C.A. § 39-11-402(2) (1991)). Physical participation in the crime is not a prerequisite to criminal responsibility. *See Caldwell*, 80 S.W.3d at 38. The crimes committed by Messrs. Sims and Terry against the victims were the natural and probable consequences of the group's decision to drive around committing random crimes to obtain money for the gang. *See Howard*, 30 S.W.3d at 276 (citing *Carson*, 950 S.W.2d at 954-55). In our view, the evidence was sufficient to support each of the defendant's convictions in this case.

*Conclusion*

Accordingly, we affirm the judgments of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE